Samuel H. Ruby (CSB#191091)
Judith A. Whitehouse (CSB#198176)
Paris Scott (CSB#248899)
BULLIVANT HOUSER BAILEY PC
601 California Street, Suite 1800
San Francisco, California 94108
Telephone: 415.352.2700
Facsimile: 415.352.2701
samuel.ruby@bullivant.com
judith.whitehouse@bullivant.com
paris.scott@bullivant.com

*Attorneys for Defendant*
Travelers Indemnity Company of Connecticut

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LA VELDA SINGLETON dba LOVE AND CARE PRESCHOOL,<br><br>Plaintiff,<br><br>vs.<br><br>TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, et al.,<br><br>Defendants. | Case No.: C 08 1852 (CW)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRAVELERS' OPPOSITION TO MOTION TO REMAND**<br><br>Hearing Date: Vacated<br>(previously scheduled for June 5, 2008) |

TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY ................................................................................. 1

II. BACKGROUND ................................................................................................................ 2

    A. The Policy ................................................................................................................... 2

    B. Travelers' Actual Cash Value Payments ................................................................... 3

    C. Plaintiff's Repair Estimates ....................................................................................... 4

    D. The Appraisal ............................................................................................................. 4

III. MOTION STANDARD .................................................................................................... 5

IV. ARGUMENT .................................................................................................................... 5

    A. Textron's Joinder Does Not Destroy Diversity .......................................................... 5

        1.   Textron Is A Diverse Defendant .......................................................................... 5

        2.   Textron Financial Cannot Be Liable For Breach Of Contract ............................ 6

        3.   Textron Financial Cannot Be Liable For Bad Faith ............................................ 7

    B. Bank Of The West Is A Sham Defendant .................................................................. 8

    C. Uren Is A Sham Defendant ......................................................................................... 8

        1.   The Negligence Claim Alleged In Plaintiff's Motion Makes No Sense ............. 9

        2.   The Negligence Claim Alleged In Plaintiff's Complaint Is Time-
            Barred 10

    D. Delgado Is A Sham Defendant .................................................................................. 10

    E. Hasenin Is A Sham Defendant .................................................................................. 12

        1.   Travelers Committed No Tort ............................................................................ 13

        2.   Hasenin Did Not Render "Substantial Assistance" To Any Tort ...................... 13

        3.   Expert Witnesses Cannot Be Sued For Aiding And Abetting .......................... 13

    F. Zilinki, Morton, And Their Companies Are Sham Defendants ................................ 15

        1.   Agents Of Insurers Cannot Be Liable For "Bad Faith" .................................... 15

        2.   If It Existed At All, Plaintiff's Claim Is Time-Barred ...................................... 16

    G. Travelers' Notice Of Removal Was Not Defective .................................................. 17

V. CONCLUSION ................................................................................................................ 17

TRAVELERS' OPPOSITION TO MOTION TO REMAND

1

## TABLE OF AUTHORITIES

2

3

Page(s)

**CASES**

4

Block v. Sacramento Clinical Labs, Inc.,

5
    131 Cal. App. 3d 386 (1982)..................................................................................... 14, 15

6
Breashears v. Indiana Lumbermens Mut. Ins. Co.,

7
    256 Cal. App. 2d 245 (1967)............................................................................................. 3

8
Carden v. Getzoff,
    190 Cal. App. 3d 907 (1987)..................................................................................... 14, 15

9
Carma Developers (California) Inc. v. Marathon Development California, Inc.,

10
    2 Cal. 4th 342 (1992)............................................................................................... 7, 8

11
Casey v. United States Bank Nat. Ass'n,
    127 Cal. App. 4th 1138 (2005)...................................................................................... 14

12

13
Cavallini v. State Farm Mutual Auto Ins. Co.,
    44 F.3d 256 (5th Cir. 1995.)..................................................................................... 5, 6

14
Christensen v. Superior Court,

15
    54 Cal. 3d 868 (1991)............................................................................................. 11, 12

16
Coffman v. Kennedy,
    74 Cal. App. 3d 28 (1977)........................................................................................... 13

17

18
Diamond v. Insurance Co. of North America,
    267 Cal. App. 2d 415 (1968)....................................................................................... 13

19
Doctors' Co. v. Superior Court,

20
    49 Cal. 3d 39 (1989).................................................................................................. 15

21
Farias v. Bexar County,
    925 F.2d 866 (5th Cir. 1991)....................................................................................... 17

22

23
Good v. Prudential Ins. Co. of America,
    5 F. Supp. 2d 804 (N.D. Cal. 1998) (Wilken, J.) ......................................................... 5

24
Gruenberg v. Aetna Ins. Co.,

25
    9 Cal. 3d 566 (1973)............................................................................................... 15, 16

26
Howard Jarvis Taxpayers Ass'n v. City of La Harba,
    25 Cal. 4th 809 (2001)........................................................................................... 11, 12

27

28
Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp Ins. Associates, Inc.,
    115 Cal. App. 4th 1145 (2004).................................................................................... 10

TRAVELERS' OPPOSITION TO MOTION TO REMAND

Kiseskey v. Carpenters' Trust for So. California,
   144 Cal. App. 3d 222 (1983) ................................................................. 11

Love V. Fire Ins. Exchange,
   21 Cal. App. 3d 1136 (1990) ................................................................. 16

Marselis v. Allstate Ins. Co.,
   121 Cal. App. 4th 122 (2004) ............................................................... 16

McCorkle v. State Farm Fire Ins. Co.,
   221 Cal. App. 3d 610 (1990) ................................................................... 3

Morris v. Princess Cruises, Inc.,
   236 F.3d 1061 (9th Cir. 2001) ................................................................. 5

Puglese v. Sup. Ct,
   146 Cal. App. 4th 1444 (2007) ............................................................. 11

Ricard v. Pacific Indemnity Co.,
   132 Cal. App. 3d 886 (1982) ................................................................. 12

S.E.C. v. Buntrock,
   2004 WL 1179423 (N.D. Ill. 2004) ...................................................... 16

Sanchez v. Lindsey Morden Claims Services, Inc.,
   72 Cal. App. 4th 249 ..................................................................... 15, 16

Schlauch v. Hartford Accident & Indemnity Co.,
   146 Cal. App. 3d 926 ........................................................................... 12

Schoolcraft v. Ross,
   81 Cal. App. 3d 75 (1978) ....................................................................... 7

Soto v. Royal Globe Ins. Co.,
   184 Cal. App. 3d 420 (1986) ................................................................. 12

Taylor v. California State Auto. Ass'n,
   194 Cal. App. 3d 1214 (1987) ............................................................... 12


STATUTES

15 U.S.C.A. § 78t(e) .............................................................................. 16

California Civil Code § 47 ...................................................................... 14

CCP § 339 ............................................................................................... 16

Insurance Code section 2071 .................................................................... 4

TRAVELERS' OPPOSITION TO MOTION TO REMAND

CCP § 339(1)..................................................................................................................... 10

TRAVELERS' OPPOSITION TO MOTION TO REMAND

# I. <u>INTRODUCTION AND SUMMARY</u>

Plaintiff's motion to remand should be denied because the non-diverse defendants are fraudulently joined.  More specifically:

- Bank of the West is a sham defendant because (a) plaintiff's claims against it for breach of contract and bad faith are based on a case that is no longer good law, and (2) even if that case were still good law, the claims would fail because the *facts* alleged with respect to Bank of the West are indisputably false.

- Uren Harrison Kennedy Insurance Agency is a sham defendant because (a) the negligence claim alleged in the Complaint is time-barred, and (b) the different negligence claim that plaintiff attempts to articulate in her motion makes no sense.

- Allyson Delgado is a sham defendant because (a) plaintiff's complaint does not allege conduct that qualifies as "outrageous" under the applicable standard, and (b) even if it does, plaintiff's claim for intentional infliction of emotional distress is time-barred.

- Isam Hasenin, who is sued for "aiding and abetting" Travelers' alleged bad faith, is a sham defendant because (a) the policy did not obligate Travelers to pay for code upgrades in advance, (b) Hasenin had nothing to do with Travelers' position regarding the timing of code upgrade payments, and (c) Hasenin was an expert witness, and expert witnesses cannot be sued over their expert reports and testimony by adverse parties.

- Chris Morton, Murat Zilinki, and their employers (Hohback-Lewin, Inc. and Walter Springs Construction) are sham defendants because (a) California law does not recognize a cause of action against claim consultants for bad faith, and (b) if it did, any claim in this case would be time-barred, and (c) ins

Finally, defendant Textron Financial Corporation is a *diverse* defendant, so although Travelers submits that Textron is a sham defendant, the Court need not reach the issue because Textron's presence in the lawsuit would not destroy diversity.

TRAVELERS' OPPOSITION TO MOTION TO REMAND

## II. BACKGROUND

### A.    The Policy

Travelers issued to plaintiff a policy of commercial property and liability insurance concerning plaintiff's real and personal property at 8010 Hollanda Lane in Dublin, California. The policy's "Building and Personal Property Coverage Form" provides that Travelers "will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss." (Ruby Decl., Ex. B ("the Policy") at B-8.)  Where the insured replaces the lost or damaged property, the insured can recover on a "replacement cost" basis.  (Id. at B-17.)  Prior to replacing the property, the insured can recover only on an "actual cash value" basis.  (Id.)

Generally, replacement cost is what it should reasonably cost "to replace, on the same premises, the lost or damage property with other property (a) of comparable material and quality, and (b) used for the same purpose."  (Id.)  Sometimes, an insured cannot rebuild strictly with "comparable material and quality" because building codes have changed since the original construction.  By way of a "Property Extra Plus" endorsement, Travelers' policy supplements the basic replacement cost coverage with "Ordinance or Law Coverage," also known as code upgrade coverage.  Under that coverage, the insured can recover "the increased cost to repair, rebuild or construct the property cause by enforcement of building, zoning or land use ordinance or law." (Id. at B-25.)  As with the replacement cost coverage, the code upgrade coverage applies only if the insured actually replaces the property and incurs code upgrade costs.  (Id.)

Where the insured chooses *not* to replace the property, the insured may make a claim for "on an actual cash value basis instead of on a replacement cost basis."  (Id. at B-17.)  The policy defines actual cash value as "the amount it would cost to repair or replace Covered Property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence."  (Id. at B-36.)  Thus, the difference between replacement cost basis and actual cash value basis is simply depreciation.  The insured can elect "to have the damage settled on an actual cash value basis" first, before replacing the

TRAVELERS' OPPOSITION TO MOTION TO REMAND

1  property, and "still make a claim" on a replacement costs basis after the work is done. (Id. at

2  B-17.)

3      Because actual cash value is based on the cost to replace "with material of like kind and

4  quality," an insured cannot make an actual cash value claim for anticipated costs of code

5  upgrades. Indeed, California law does not *allow* an insured to recover the actual cash value of

6  improvements that did not exist at the time of the loss. Bischel v. Fire Insurance Exchange, 1

7  Cal. App. 4th 1168 (1992); McCorkle v. State Farm Fire Ins. Co., 221 Cal. App. 3d 610, 615

8  (1990); Breashears v. Indiana Lumbermens Mut. Ins. Co., 256 Cal. App. 2d 245, 248 (1967).

9  Only once code upgrades are actually built can an insured recover for their costs.

10 **B.     Travelers' Actual Cash Value Payments**

11      Plaintiff's property was damaged by a fire on November 17, 2004. Travelers

12 immediately dispatched adjuster Jim Davis to the scene, and within days, Davis issued plaintiff

13 a check for $15,000 for the actual cash value of the personal property that she lost in the fire.

14 (Delgado Decl., ¶ 3.) Shortly thereafter, the claim was reassigned to adjuster Allyson Delgado.

15 (Id., ¶ 2.) To assist her in determining the extent of the damage to the building and the cost of

16 repairs, Delgado consulted with Hohback-Lewin, Inc. (structural engineers) and Walter Springs

17 Construction, Inc. (a general contractor). (Id., ¶ 4.)

18      On November 22, 2004, Delgado—joined by Chris Morton of Hohback-Lewin and

19 Murat Zilinki of Walter Springs—inspected the property. (Id., ¶ 5.) Plaintiff declined to

20 attend. (Id.) After the inspection, Delgado received a report from Morton regarding the extent

21 of the structural damage. (Id., ¶ 7 & Ex. A.) Also, Delgado received from Zilinki an estimate of

22 the cost of replacing the damaged portions with material of "like kind and quality." (Id., ¶ 8 &

23 Ex. B.) The estimate, which came to $176,715.59, was not only an estimate but also a bid—

24 Zilinki was hoping plaintiff would hire his company to do the work. (Id.)

25      In December 2004, while continuing to review the claim, Delgado issued an advance of

26 $50,000 to plaintiff towards the actual cash value of the building damage. (Id., ¶ 9.) In

27 February 2005, completed her adjustment the claim based on Zilinki's bid. After applying

28 depreciation, the policy deductible, and credit for the previous advance, Delgado approved a

1  further actual cash value payment of $104,852.49.  (Id., ¶ 12.)  Because plaintiff's mortgagee,

2  Textron, was named as an additional insured and loss payee in the policy, the check named

3  Textron as a co-payee.  (Id., ¶ 13.)

4      On February 16, 2005, Delgado wrote to plaintiff to explain the actual cash value

5  settlement.  (Id., ¶ 14 & Ex. D.)  With the letter, Delgado enclosed copies of the Morton report

6  and the Zilinki bid.  (Id.)  Delgado's letter advised plaintiff that she could make a supplemental

7  claim on a replacement cost basis—including a claim for code upgrade costs—if she were to

8  actually replace the building.  (Id.)  Plaintiff did not respond to the letter, nor to a follow-up

9  letter sent by Delgado in April 2005.  (Id., ¶ 15 & Ex. E.)

10  **C.    Plaintiff's Repair Estimates**

11      Plaintiff chose not to have Zilinki's company do the repairs.  Eventually, she solicited

12  estimates from other contractors.  On July 10, 2005, Delgado received a copy of an estimate that

13  plaintiff has solicited from Emmett Construction.  (Id., ¶ 16.)  Emmett's estimate was higher

14  than Zilinki's bid, but Delgado was not sure why.  (Id.)  That same month, Delgado reinspected

15  the property, and this time, plaintiff met with her.  (Id., ¶ 18.)

16      Plaintiff apparently chose not to hire Emmett Construction, because on August 22, 2005,

17  Delgado received a quote that plaintiff had solicited from another contractor, Snow

18  Construction.  (Id., ¶ 19.)  Snow's quote was even higher than Emmett's estimate.  (Id.)

19  Delgado asked Snow to meet with her to go over his quote, but he never responded.  (Id., ¶ 20 &

20  Ex. F.)

21  **D.    The Appraisal**

22      On September 13, 2005, Delgado received by fax a letter from Kevin Dawson, a public

23  adjuster, advising that plaintiff had retained him to represent her in connection with the claim.

24  (Id., ¶ 21 & Ex.G.)  Dawson never made a specific request for any additional payment on an

25  actual cash value basis, but he demanded appraisal, which is a type of arbitration provided for

26  by the policy and Insurance Code section 2071.  (Id., ¶ 23.)  Travelers did not believe the claim

27  was ripe for appraisal, but rather than litigate the issue, Travelers submitted to the process.  (Id.)

28

1    The parties submitted documents to the appraisers, and at Dawson's insistence, the

2  appraisers held a hearing in April 2007. (Ruby Decl., ¶ 6.) Travelers called Morton, Zilinki,

3  and others (including defendant Isam Hasenin) to testify at the hearing. (Id., ¶ 11.) In May

4  2007, the appraisers rendered an award, but plaintiff rejected it and filed this lawsuit.

5                          **III. MOTION STANDARD**

6        Because all of the defendants besides Travelers are fraudulently joined, their citizenship

7  does not destroy diversity jurisdiction. "A defendant may remove a case with a non-diverse

8  defendant . . . and seek to persuade the district court that this defendant was fraudulently

9  joined." Good v. Prudential Ins. Co. of America, 5 F. Supp. 2d 804, 806 (N.D. Cal. 1998)

10 (Wilken, J.) (denying motion to remand). Despite the doctrine's use of the word "fraudulently,"

11 the test is not one of intent. "The defendant need not show that the joinder of the non-diverse

12 party was *for the purpose of* preventing removal." Id. at 807. The defendant need only

13 demonstrate that in fact, "there is no possibility that the plaintiff will be able to establish a cause

14 of action in State court against the alleged sham defendant." Id.

15       "The defendant seeking removal is entitled to present facts showing that the joinder is

16 fraudulent." Id. "The court may look beyond the pleadings and consider affidavits or other

17 evidence to determine if the joinder was a sham." Morris v. Princess Cruises, Inc., 236 F.3d

18 1061, 1068 (9th Cir. 2001). In other words, "fraudulent joinder [issues] may be resolved by

19 'piercing the pleadings' and considering summary judgment-type evidence." Cavallini v. State

20 Farm Mutual Auto Ins. Co., 44 F.3d 256, 263 (5th Cir. 1995.)

21                            **IV. ARGUMENT**

22 A.    **Textron's Joinder Does Not Destroy Diversity**

23       1.    **Textron Is A Diverse Defendant**

24       Plaintiff sues Textron Financial Corporation for breach of contract and breach of the

25 implied covenant of good faith and fair dealing. As Travelers' Notice of Removal states,

26 Textron is not a citizen of California. (Notice of Removal at 5:1-6.) Textron is incorporated in

27

28

TRAVELERS' OPPOSITION TO MOTION TO REMAND

1  Delaware, and its principal place of business in Rhode Island. (Id.) Thus, Textron is a citizen

2  of Delaware and Rhode Island. In her motion, plaintiff does not dispute these facts.[1]

3       Because Textron is not a citizen of California, its presence in this lawsuit will not

4  destroy diversity. Consequently, to deny plaintiff's motion to remand, it is not necessary that

5  the Court find that Textron is a sham defendant. That said, Textron *is* a sham defendant

6       **2.    Textron Financial Cannot Be Liable For Breach Of Contract**

7       Plaintiff's complaint alleges that Textron held her mortgage at the time of the fire, that

8  she forwarded Travelers' actual cash value payments to Textron (because it was named as a co-

9  payee on the checks), and that instead of releasing the funds back to her to use for repairs,

10 Textron applied the proceeds to her loan balance. (Ruby Decl., Ex. A ("the Complaint").)

11 Plaintiff contends that said application of the procedds amounted to a breach of contract, but

12 the contract plainly proves otherwise.

13      Plaintiff obtained the loan in question in October 1999 from Westminster Development

14 Bank. (Delgado Decl., Ex. C.) In conjunction with the note, plaintiff executed a Loan and

15 Security Agreement giving Westminster a security interest in the collateral for the loan.

16 Westminster subsequently changed its name to Textron, which explains why plaintiff is suing

17 Textron instead of Westminster.

18      Paragraph 4.11 of the Loan and Security Agreement states:

19          4.11 Insurance. Debtor shall have and maintain insurance at all
            times with respect to all tangible Collateral insuring against risks
20          of fire, theft and other risks (so-called "All Risk") as Secured
            Party may require, containing such terms, in such form and
21          amounts and written by such companies as may be satisfactory to
            Secured Party, all of such insurance to contain a loss payable
22          clause in favor of Secured Party, as their interest may appear. All
            policies of insurance shall provide for 30 days' written minimum
23          cancellation notice to Secured Party and, at the request of Secured
            party, shall be delivered to and held by it. Such insurance shall be
24          primary to Secured Party and non-contributory with any other
            insurance carried by Secured Party. The insurance shall not be
25          invalidated as against Secured Party for any violation of any term
26

27 _____

[1] Although plaintiff does not dispute them, just for good measure, Travelers submits herewith
28 copies of Textron's articles of incorporation and its SEC filings, confirming its place of
   incorporation and principal place of business. (Ruby Decl., Ex. E.)

TRAVELERS' OPPOSITION TO MOTION TO REMAND

of the policy or Debtor's application therefor.  Upon an Event of Default, Secured Party is hereby authorized to act as attorney for Debtor in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts or instruments.  **Secured Party shall be authorized to apply the proceeds from any insurance to the Obligations secured hereby whether or not such Obligations are then due and payable.**

(Delgado Decl., Ex. C) (emphasis added).  Thus, what plaintiff alleges to have been a breach of contract—Textron's application of insurance proceeds to the loan balance—is expressly authorized by the contract.  Consequently, plaintiff's breach of contract claim fails.

### 3.    Textron Financial Cannot Be Liable For Bad Faith

Plaintiff appears to contend that by virtue of the covenant of good faith and fair dealing, which is implied in every contract, Textron's right to apply insurance proceeds to the loan balance was somehow limited or invalid.  Plaintiff relies on Schoolcraft v. Ross, 81 Cal. App. 3d 75 (1978), an opinion published by an intermediate appellate court some 30 years ago, during the infancy of "bad faith" law.  Plaintiff's reliance on Schoolcraft is misplaced, because it is no longer good law.

In Carma Developers (California) Inc. v. Marathon Development California, Inc., 2 Cal. 4th 342, 374 (1992), the California *Supreme* Court took up the issue of whether the implied covenant of good faith can be invoked to overcome the express terms of a contract.  Carma involved a commercial lease, which expressly provided that if the tenant were to attempt to sublease the property, the lessor could terminate the tenant's lease.  When the tenant informed the landlord that it wanted to sublet approximately 80% of the premises, the landlord terminated the lease.  The tenant sued for breach of the implied covenant of good faith and fair dealing.

Reversing a judgment for the tenant, the California Supreme Court held that the covenant of good faith cannot "be read to prohibit a party from doing that which is expressly permitted by an agreement."  "On the contrary," the court explained, "implied terms should never be read to vary express terms."  Id. at 373-74.  In view of the California Supreme Court's holding in Carma, the lower appellate court's ruling Schoolcraft is no longer good law.

TRAVELERS' OPPOSITION TO MOTION TO REMAND

1  Here, the loan agreement expressly permitted Textron to apply insurance proceeds to the

2  loan balance. Under <u>Carma</u>, the implied covenant of good faith did not eliminate or vary that

3  right. Thus, like her breach of contract claim, plaintiff's claim against Textron for breach of the

4  implied covenant fails as a matter of law.

5  **B.    Bank Of The West Is A Sham Defendant**

6  The loan agreement permitted Westminster (later Textron) to "sell, assign, transfer or

7  otherwise dispose of any or any part of the Obligations and/or the Collateral therefor" without

8  notice to the borrower. That provision goes on to state:

9  > In such event, each and every immediate and successive
>  purchaser, assignee, transferee or holder of all or any part of the
10 > Obligations and/or the Collateral shall have the right to enforce
>  this Agreement, by legal action or otherwise, for its own benefit as
11 > fully as if such purchaser, assignee, transferee or holder were
>  herein by name specifically given such rights;....
12

13 In September 2007, Textron assigned plaintiff's loan to Bank of the West. Plaintiff alleges that

14 like Textron, Bank of the West breached the loan agreement by applying insurance proceeds to

15 the loan balance.

16 Bank of the West is a California corporation. However, that fact does not support

17 remand, because Bank of the West is a sham defendant. For one thing, as discussed above, the

18 loan agreement expressly authorizes the secured party to apply insurance proceeds to the loan

19 balance. Thus, even if Bank of the West received insurance proceeds and applied them to the

20 loan balance, Bank of the West would not be liable for breach of contract or bad faith.

21 Moreover, plaintiff's factual allegations are indisputably false. Travelers has never

22 named Bank of the West as a co-payee on any payment to plaintiff. (Delgado Decl., ¶ 13.) All

23 of Travelers' payments to plaintiff were made long before September 2007, i.e., long before

24 Bank of the West acquired the loan. (Id.) Thus, even if plaintiff's claims against *Textron* have

25 merit, Bank of the West does not deserve to be lumped in with those claims.

26 **C.    Uren Is A Sham Defendant**

27 Plaintiff sues her insurance broker, Uren Harrison Kennedy Insurance Agency, for

28 negligence. In her complaint, she alleges that Uren was negligent because the policy does not

– 8 –

1   include business interruption coverage.  Curiously, in her motion to remand, plaintiff abandons

2   that theory and argues that Uren was negligent because the policy purportedly does not include

3   *code upgrade* coverage.  Her new claim makes no sense, and her original claim is time-barred.

4   Thus, no matter how plaintiff zigs or zags, Uren is a sham defendant.

5       **1.    The Negligence Claim Alleged In Plaintiff's Motion Makes No Sense**

6       In her motion, plaintiff articulates her claim against Uren as follows.  She alleges that

7   "Travelers claims that its policy does not provide coverage for code improvements...." (Pl.'s

8   Mot. to Remand at 4.)  She alleges that if this position that she *attributes* to Travelers is correct,

9   then Uren "failed to exercise reasonable care" and is liable for "its negligent failure to obtain

10  coverage for ordinance and code upgrades." (Id.)  No doubt, the law recognizes a cause of

11  action for professional negligence against an insurance broker who fails to secure requested

12  coverage.  However, the "failure" that plaintiff alleges in her motion is a fiction.

13      Travelers has never claimed that the policy does not include code upgrade coverage.

14  Indeed, any such claim would be ridiculous.  As discussed above, the policy (a copy of which

15  plaintiff attached to her Complaint) includes a "Property Extra Plus" endorsement, which

16  includes "Ordinance or Law Coverage," which applies to "the increased cost to repair, rebuild

17  or construct the property caused by enforcement of building, zoning or land use ordinance or

18  law." (Ruby Decl., Ex. B at B-25.)  In other words, it covers code upgrades.

19      Granted, Travelers has not yet made any *payments* under the code upgrade coverage.

20  However, that is not because Travelers denies that the coverage exists—on the contrary,

21  Travelers has always acknowledged that it exists.  Travelers anticipates that some code upgrades

22  will be required, but Travelers has exercised its right not to pay for any upgrade costs before

23  they are actually incurred.[2]

24      Lest there be any lingering confusion, let it be said loud and clear:

25      • The policy **does** include code upgrade coverage.

26

27  _____

28  [2] Travelers has also been unable to verify *which* improvements in plaintiff's reconstruction plans
    are in fact required by laws or ordinances, but unless and until plaintiff actually implements
    those plans, the issue will be moot.

TRAVELERS' OPPOSITION TO MOTION TO REMAND

1    • Uren did **not** fail to procure such coverage.

2    • Travelers does **not** deny and has **never** denied that such coverage is included in
3       the policy

4    • The reason why Travelers has made no payments towards code upgrade costs is
5       that plaintiff has not yet **incurred** any such costs.

6    The negligence claim that plaintiff articulates in her motion to remand is a sham.

7    **2.     The Negligence Claim Alleged In Plaintiff's Complaint Is Time-Barred**

8    In her Complaint, plaintiff alleges that Uren failed to procure *business interruption*
9    coverage. It is true that the policy does not include such coverage. Why, then, did plaintiff
10   abandon that claim and try to articulate a different claim in her motion? Because any claim
11   against Uren for failing to procure business interruption coverage is time-barred.

12   The statute of limitations on a claim against an insurance broker for professional
13   negligence is two years. CCP § 339(1); <u>Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp</u>
14   <u>Ins. Associates, Inc.</u>, 115 Cal. App. 4th 1145 (2004). Indeed, this two-year statute applies even
15   if the insured tries to style her negligence claim as one for negligent misrepresentation. <u>Id</u>. Of
16   course, a statute of limitations does not begin to run until the cause of action has accrued. In
17   some cases, a negligence claim against an insurance broker will not accrue until the insured is
18   harmed by the negligence.

19   Arguably, plaintiff was not harmed by Uren's alleged negligence in failing to procure
20   business interruption coverage until the fire occurred and she suffered her alleged loss of
21   income. However, the fire occurred on November 17, 2004. Thus, at the latest, any claim
22   against Uren should have been brought no later than November 17, 2006. Uren is a sham
23   defendant and should be dismissed.

24   **D.     Delgado Is A Sham Defendant**

25   A statute of limitations also defeats plaintiff's claim against Travelers' adjuster,
26   Delgado. Plaintiff sues Delgado for intentional infliction of emotional distress ("IIED"). The
27   elements of that tort are "(1) extreme and outrageous conduct by the defendant with the
28   intention of causing, or reckless disregard of the probability of causing, emotional distress; (2)

1  the plaintiff's suffering of severe or extreme emotional distress; and (3) actual and proximate

2  causation of the emotional distress by the defendant's outrageous conduct." Christensen v.

3  Superior Court, 54 Cal. 3d 868, 903 (1991). A claim for IIED is considered to be a claim for

4  personal injury, which is subject to a two-year statute of limitations.

5      Plaintiff's complaint alleges that Delgado did five "outrageous" things. Plaintiff alleges

6  that Delgado (1) induced Morton to "falsify his engineering report," (2) induced Zilinki to

7  submit a "lowball estimate," (3) concealed "building estimates that were substantially higher"

8  than Zilinki's, (4) delayed the actual cash value payments to plaintiff and Textron, and (5) was

9  "abusive . . . in words and actions" when they met during Delgado's re-inspection of the

10 property. Travelers disputes the negative "spin" that plaintiff puts on her dealings with

11 Delgado, but in any event, all of those dealings occurred in 2004 and 2005—more than two

12 years before plaintiff filed this action.

13     Plaintiff argues that her emotional distress "damages" were not "ascertainable" until

14 some later date, but she does not explain this theory. A jury verdict, calculating and awarding

15 damages for emotional distress, is not necessary to start the running of the statute of limitations.

16 Rather, as explained in a case plaintiff herself cites, "a cause of action accrues upon the

17 occurrence of the *last element essential to the cause of action*." Howard Jarvis Taxpayers Ass'n

18 v. City of La Harba, 25 Cal. 4th 809, 815 (2001). The essential element that completes an IIED

19 claim is the suffering of extreme emotional distress. Kiseskey v. Carpenters' Trust for So.

20 California, 144 Cal. App. 3d 222 (1983).

21     Either the conduct alleged in plaintiff's complaint caused her to suffer extreme

22 emotional distress, or it did not. If it did, then plaintiff may have had a cause of action for IIED,

23 but it is now time-barred. If it did not, then plaintiff never had a cause of action for IIED at all.

24 Either way, her attempt to sue Delgado for IIED now fails as a matter of law.

25     Plaintiff argues that "where the wrong complained of is ongoing, the cause of action is

26 subject to continuous accrual for statute of limitations purposes." Plaintiff cites Puglese v. Sup.

27 Ct, 146 Cal. App. 4th 1444 (2007), for this proposition, but she does not explain how that

28 proposition assists her here. Delgado's last alleged "outrageous" act was "abusing" plaintiff at

1  their meeting during Delgado's site re-inspection in July 2005. (Delgado Decl., ¶ 18.) In

2  September 2005, plaintiff hired a public adjuster to handle her claim, and since then, plaintiff

3  has not met with nor spoken to Delgado. (Id., ¶ 22.) Thus, the "continuing conduct" rule does

4  not justify plaintiff's failure in delaying until February 2008 to file suit.

5      Plaintiff asserts that she still suffers "anxiety" when *thinking back on* Delgado's alleged

6  conduct in 2004-2005. She appears to argue that each time she has suffered a little more

7  emotional distress over that conduct, her time to sue has been renewed. However, plaintiff cites

8  no authority for such a proposition. Under City of La Harba, supra, a cause of action accrues

9  and the statute of limitations begins to run as soon as the plaintiff suffers injury. It is irrelevant

10 whether, and when, the injury ends. A person who is permanently disabled by an automobile

11 accident cannot wait indefinitely to file a lawsuit because of the "continuing" nature of his

12 injury. Similarly, if plaintiff's emotional distress persisted after the outrageous conduct ended,

13 that fact would does not render her claim timely.

14      For the record, Travelers disputes that Delgado did the nefarious deeds alleged in the

15 Complaint. And even if those facts were true, Travelers would dispute that they establish

16 "outrageous" conduct. To qualify as "outrageous," conduct "must be so extreme as to exceed

17 all bounds of that usually tolerated in a civilized community." Christensen, 54 Cal. 3d at 903.

18 Courts have frequently found, as matter of law, that a denial of an insurance claim is not

19 sufficiently outrageous to support an IIED claim. See, e.g., Ricard v. Pacific Indemnity Co.,

20 132 Cal. App. 3d 886, 895 (1982); Schlauch v. Hartford Accident & Indemnity Co., 146 Cal.

21 App. 3d 926; Soto v. Royal Globe Ins. Co., 184 Cal. App. 3d 420 (1986); Taylor v. California

22 State Auto. Ass'n, 194 Cal. App. 3d 1214 (1987). The present claim does not even involve a

23 denial, but rather, merely an alleged delay and/or underpayment by some unspecified margin.

24 **E.    Hasenin Is A Sham Defendant**

25      Plaintiff alleges that the Travelers breached the implied covenant of good faith and fair

26 dealing in the insurance policy by not paying for anticipated code upgrade costs in advance.

27 Plaintiff alleges that said breach constitutes an intentional tort. Plaintiff sues Isam Hasenin, a

28

–12–

building code expert consulted by Travelers, for "aiding and abetting" Travelers in the
commission of that tort. Plaintiff's claim against Hasenin fails for several reasons.

### 1.    Travelers Committed No Tort

It is true that Travelers has not yet made any payments to plaintiff under the code
upgrade coverage. However, Travelers has committed no breach of contract—much less, a
breach of the implied covenant ("bad faith"). Once again, the policy's code upgrade coverage
plainly provides:

> We will not pay for increased costs under this coverage:
>
> (1) Until the property is actually repaired or replaced, at the same
> location or elsewhere if required by ordinance or law; …

Such conditions are valid and enforceable. Diamond v. Insurance Co. of North America, 267
Cal. App. 2d 415 (1968). Here, plaintiff has not yet actually repaired or replaced the building—
indeed, she admits at the outset of her motion that the building "is still in ruins." Because
Travelers has never been obligated to make any payment under the code upgrade coverage, it
has committed no tort by withholding payment. Because Travelers has done nothing wrong,
Hasenin can hardly be liable even if he has somehow "aided and abetted" Travelers.

### 2.    Hasenin Did Not Render "Substantial Assistance" To Any Tort

Even if Travelers has somehow committed a tort by not paying for code upgrade costs in
advance, Hasenin cannot be liable for aiding and abetting, because he has done nothing to
further such a tort. Liability for aiding and abetting may be imposed only where the defendant
has given "substantial assistance or encouragement" to the tortfeasor. Coffman v. Kennedy, 74
Cal. App. 3d 28, 31 (1977). Travelers has declined to pay for code upgrade costs in advance
because of its interpretation of the policy and the law—not because of anything Hasenin has
said or done. If Travelers' interpretation is incorrect, that is not Hasenin's fault.

### 3.    Expert Witnesses Cannot Be Sued For Aiding And Abetting

Travelers anticipated needing a building code expert for the appraisal hearing because
plaintiff's public adjuster, Dawson, had indicated that he would present evidence of the
upgrades in plaintiff's reconstruction plans and ask the appraisers to rule that all of the upgrades

TRAVELERS' OPPOSITION TO MOTION TO REMAND

1  are required by building codes. (Ruby Decl., ¶ 8.) Though Travelers had no duty then (or now)

2  to pay for code upgrades in advance, Travelers did not want to let Dawson's arguments

3  concerning the plans go unchallenged, because any ruling might have fixed the amount for

4  which Travelers would be liable if plaintiff were to ever actually rebuild according to those

5  plans. (Id., ¶ 9.) Thus, Travelers retained Hasenin to review the plans and (if necessary) testify

6  as an expert witness at the appraisal hearing. (Id.)

7  At the hearing, Dawson did in fact submit the plans and argue that all of the upgrades in

8  the plans were required by building codes. (Id., ¶ 10.) In response, Travelers called Hasenin,

9  who testified that in his opinion, many of the upgrades were not required. (Id., ¶ 11.) Two of

10  the appraisers (the umpire, retired San Francisco Superior Court Judge William Cahill, and

11  Travelers' appraiser, Steve Tilghman) accepted Hasenin's testimony and rendered an award

12  based upon it. (Id., ¶ 12-13.)[3]

13  Nonetheless, plaintiff contends that Hasenin's testimony was false and is trying to sue

14  him for it. It was not false, but moreover, plaintiff cites no authority for the proposition that a

15  party may sue an adverse party's expert witness over his testimony. The case that plaintiff cites,

16  Casey v. United States Bank Nat. Ass'n, 127 Cal. App. 4th 1138 (2005), did not involve a claim

17  against an expert witness. Other cases confirm that in view of the litigation privilege embodied

18  by California Civil Code section 47, expert witnesses may not be sued for alleged falsehoods in

19  their reports or testimony. See Carden v. Getzoff, 190 Cal. App. 3d 907, 909 (1987); Block v.

20  Sacramento Clinical Labs, Inc., 131 Cal. App. 3d 386 (1982).

21

22

---

23  [3] Contrary to the declaration of plaintiff's current counsel, who was not involved in the appraisal
proceedings, Tilghman signed the award before his death. (Ruby Decl., ¶ 12  & Ex.D.)  After

24  his death, plaintiff challenged the award on the grounds that Dawson purportedly did not have
plaintiff's permission to submit the issue of code upgrades to the appraisers. (Id., ¶ 13.) In

25  response to plaintiff's petition, the Alameda Superior Court vacated the award. (Id.) It was
because of plaintiff's petition—not Tilghman's death—that the award was not confirmed by the

26  court. (Id.) Unfortunately, this is just one of several examples of plaintiff's counsel playing fast
and loose with the facts in his declaration and plaintiff's brief. Another example is the assertion

27  that Travelers "denied" a business interruption claim, when in fact plaintiff never even made
such a claim, because both Uren and Travelers brought the policy's lack of business interruption

28  coverage to her attention immediately after the fire.

---

TRAVELERS' OPPOSITION TO MOTION TO REMAND

**F.    Zilinki, Morton, And Their Companies Are Sham Defendants**

In addition to Hasenin, plaintiff sues Zilinki, Morton, and their companies for aiding and abetting.  As with Hasenin, her claim appears to be based in part on a theory that Zilinki and Morton falsely testified at the appraisal hearing when they were called by Travelers as expert witnesses.  Insofar as her claim against them is based on that testimony, it fails under Carden and Block.  The only remaining issue is whether Zilinki, Morton, and their companies may be sued for their involvement in the claim *before* plaintiff demanded appraisal.

Plaintiff contends that Morton falsified his engineering report to understate the *extent* of the damage to the structure.  Plaintiff contends that Zilinki falsified his bid to understate the *cost* of repairing the damage.  By such shenanigans, plaintiff contends, Morton and Zilinki aided and abetted Travelers in "lowballing" the actual cash value settlement.  Plaintiff's allegations are untrue, but even if they were true, her claim against Morton, Zilinki, and their employers would fail as a matter of law—for two reasons separate but equally compelling reasons.

**1.    Agents Of Insurers Cannot Be Liable For "Bad Faith"**

Plaintiff cites no precedent supporting her claim against the consultants, because there is none.  For thirty-five years, the California Supreme Court and the California Courts of Appeal have repeatedly precluded policyholders from suing an insurance company's adjusters, consultants, and other agents for bad faith.  The Supreme Court first laid down the law in Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566 (1973), where the court dismissed bad faith claims against an insurer's independent adjusters and attorneys.  The Supreme Court reaffirmed the law in Doctors' Co. v. Superior Court, 49 Cal. 3d 39 (1989), where it dismissed a bad faith claim against an expert (a doctor) whom the insurer had consulted in the course of the claim.  More recently, in Sanchez v. Lindsey Morden Claims Services, Inc., 72 Cal. App. 4th 249 799 (1999), a California Court of Appeal thwarted an insured's attempt to get around Gruenberg and Doctors by styling his claim against an independent adjuster as one for negligence.

Here, instead of naming the consultants as co-defendants to her bad faith claim against Travelers (i.e., her third cause of action), plaintiff recites against them a separate cause of action, which she labels "aiding and abetting" bad faith.  Such artful pleading does not

1 overcome Gruenberg, Doctors, and Sanchez. Those cases demonstrate the California courts'

2 strong and enduring hostility towards extending liability for bad faith to parties other than

3 insurance companies. Having closed the floodgates to bad faith suits against adjusters,

4 consultants, and other agents so emphatically, surely the California Supreme Court and the

5 Court of Appeal did not intend that that they could be opened by artful pleading.[4]

6         **2.    If It Existed At All, Plaintiff's Claim Is Time-Barred**

7       Perhaps because the cause of action is so obscure, there appear to be no published

8 California decisions addressing the question of what statute of limitations applies to a claim for

9 aiding and abetting. Logically, however, the applicable statute is the statute that applies to the

10 tort that the defendant allegedly aided and abetted. See, e.g., S.E.C. v. Buntrock, 2004 WL

11 1179423 (N.D. Ill. 2004) (an action for aiding and abetting under 15 U.S.C.A. § 78t(e) is

12 governed by the statute of limitations applicable to the primary violation). There is no reason

13 why a plaintiff should have *more* time to sue a defendant as an "aider and abettor" than as a

14 principal tortfeasor.

15       Here, the alleged principal tortfeasor was Travelers, and the tort that Travelers allegedly

16 committed was a breach of the implied covenant of good faith and fair dealing (aka "bad faith").

17 The statute of limitations on bad faith, as a tort, is two years. CCP § 339; Love V. Fire Ins.

18 Exchange, 21 Cal. App. 3d 1136, 1144 (1990). Where, as here, the insurer does not deny the

19 claim but instead settles it (albeit for less than the plaintiff would like), the statute of limitations

20 runs from the date of the payment. Marselis v. Allstate Ins. Co., 121 Cal. App. 4th 122, 125-26

21 (2004). Furthermore, with respect to an aider and abettor, the statute of limitations would

22 logically run from when the "substantial assistance or encouragement" was provided.

23       Here, by either reference point, the claims against Morton, Zilinki, and their employers

24 are untimely. Morton and Zilinki issued their reports in 2004. (Delgado Decl., ¶ 7 & Ex. A

25 &B.) Based on those documents, Travelers settled the actual cash value claim in February

26

---

27 [4] The Casey case cited by plaintiff did not involve an insurance bad faith claim, but rather, a fraud claim against a bank. Here, plaintiff does not sue the consultants for fraud, nor could

28 she—because she cannot allege the essential element of detrimental reliance. Far from relying on the Morton report or the Zilinki estimate, plaintiff challenged them and demanded appraisal.

1 | 2005. (Id., ¶ 10-14.) Travelers' cover letter explained that the settlement was based on those

2 | documents and enclosed copies of them for plaintiff's reference. (Id., ¶ 14 & Ex. D.)

3 |      If plaintiff has ever had valid bad faith claims against Morton, Zilinki, and their

4 | employers, those claims were fully accrued by February 2005. Plaintiff should have brought

5 | suit against them no later than February 2007. This action, filed in February 2008, is a year too

6 | late—if a cause of action for bad faith even exists against claim consultants.

7 | **G.**     **Travelers' Notice Of Removal Was Not Defective**

8 |      Plaintiff alleges that in addition to Travelers, she has served Hasenin, Morton, Hohback-

9 | Lewin, Walter Springs, and Uren. Plaintiff contends that Travelers' Notice of Removal is

10 | defective because those defendants did not join in it. However, the law does not require that all

11 | served defendants consent to removal—only served defendants who are property joined in the

12 | action. Farias v. Bexar County, 925 F.2d 866, 871 (5th Cir. 1991). Because sham defendants

13 | are disregarded for jurisdictional purposes, it is hardly necessary that they "consent" to removal.

14 | Id. As discussed above, Hasenin, Morton, Hohback-Lewin, Walter Springs, and Uren are all

15 | sham defendants. Thus, their consent to removal was not required.

16 | 

**V. CONCLUSION**

17 |      For the foregoing reasons, the Court should deny plaintiff's motion to remand and

18 | dismiss the non-diverse defendants (if not also Textron Financial).

19 |

20 | DATED: May 15, 2008

21 |

22 |                          BULLIVANT HOUSER BAILEY PC

23 |              By _____

24 |                          Samuel H. Ruby
                         Paris Scott

25 |                          Attorneys for Defendant The Travelers Indemnity
                         Company of Connecticut

26 |

27 | 10504694.1

28 |

– 17 –