Samuel H. Ruby (CSB#191091)
Judith A. Whitehouse (CSB#198176)
Paris Scott (CSB#248899)
BULLIVANT HOUSER BAILEY PC
601 California Street, Suite 1800
San Francisco, California 94108
Telephone: 415.352.2700
Facsimile: 415.352.2701
samuel.ruby@bullivant.com
judith.whitehouse@bullivant.com
paris.scott@bullivant.com

*Attorneys for Defendant*
Travelers Indemnity Company of Connecticut

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LA VELDA SINGLETON dba LOVE AND CARE PRESCHOOL,<br><br>Plaintiff,<br><br>vs.<br><br>TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, et al.,<br><br>Defendants. | Case No.: CV 08 1852 (CW)<br><br>**DECLARATION OF ALLYSON DELGADO IN SUPPORT OF TRAVELERS' OPPOSITION TO MOTION TO REMAND**<br><br>Hearing Date: Vacated<br>(previously scheduled for June 5, 2008) |

I, Allyson Delgado, declare under penalty of perjury under the laws of the State of California and of the United States that the following matters are true and correct of my own personal knowledge, and that if called as a witness to testify in court, I would testify as follows:

1.    I am employed as a General Adjuster on behalf of the Travelers Indemnity Company of Connecticut and other companies in the Travelers group of companies.

2.    In November 2004, I was assigned to handle the claim of La Velda Singleton in connection with a fire on November 17, 2004 at 8010 Hollanda Lane, Dublin, California.

3.    Jim Davis, the Travelers' adjuster assigned to this claim prior to my assignment, had already issued a check for $15,000 for the actual cash value of the personal property that Ms. Singleton lost in the fire.

4.    To assist me with my investigation, I hired Hohback-Lewin, Inc., structural engineers. I also consulted with Walter Springs Construction, Inc., a general contractor.

5.    On November 22, 2004, I inspected the property at 8010 Hollanda Lane. I was joined by Chris Morton of Hohback-Lewin and Murat Zilinki of Walter Springs. Ms. Singleton declined to attend my inspection.

6.    The property consists of a corner lot in a residential area. The lot had been improved with a residential structure where Ms. Singleton had been operating a preschool. The structure was damaged by the fire. It was obvious that the roof and the interior finishes were completely damaged. However, it did not appear to me that the entire structure (including all wall and floor framing) would have to be demolished and replaced.

7.    After my November 22, 2004 inspection, I received a report from Mr. Morton. A true and correct copy of the report is attached hereto as *Exhibit A*.

8.    Also after my November 22, 2004 inspection, I received an estimate from Mr. Zilinki of the cost of replacing the damages portions with material of "like kind and quality." After my review, I asked that some additional items be added to the estimate, which resulted in it being increased to $176,715.59. This estimate was also a bid because Mr. Zilinki was hoping to get the job. A true and correct copy of the upwardly-revised estimate of Mr. Zilinki of Water Springs, which I received in December 2004, is attached hereto as *Exhibit B*.

9.    On December 27, 2004, I approved and caused to be issued an advance of $50,000 towards Ms. Singleton's building claim.

10.    On February 10, 2005, I spoke with Ms. Singleton's insurance broker. The broker advised me that Ms. Singleton had not selected a contractor. On February 11, 2005, I spoke with Ms. Singleton by telephone. She confirmed that she had not yet selected a contractor. I told her that because she did not have any other estimates, I would proceed to

1  adjust the claim and make a further payment based on the estimate of Mr. Zilinki of Walter

2  Springs Construction.

3      11.    During my February 11, 2005 conversation with Ms. Singleton, she asked me

4  about code upgrades.  I confirmed to her that her policy covers the costs of code upgrades.  I

5  advised her that the limit of the code upgrade coverage was $250,000.  However, I explained to

6  her that the policy covers code upgrade costs only if and when such costs are actually incurred.

7  In the meantime, I would be adjusting her loss on an actual cash value basis, meaning cost of

8  repairing with like kind and quality minus depreciation.

9      12.    Per my request, the estimate I received from Mr. Zilinki of Walter Springs

10 Construction had based on the cost to repair or replace with like kind and quality.  Adjusting the

11 estimate for depreciation, adding a small sum for emergency repair costs that Ms. Singleton had

12 incurred, and subtracting the $50,000 previously advanced and the policy's $500 deductible, I

13 approved and caused to be issued a further payment of $104,852.49.

14     13.    When I approved the further payment of $104,852.49, I discovered that the

15 property was encumbered and that the policy listed a lending company called Textron as a loss

16 payee.  A true and correct copy of the loan agreement, which I received while I was handling

17 the claim, is attached hereto as ***Exhibit C***.  In accordance with policy terms, I arranged that the

18 check for $104,852.49 be made out to Ms. Singleton and Textron jointly.

19     14.    On February 16, 2005, I wrote to Ms. Singleton concerning the status of her

20 claim and explaining the actual cash value settlement.  A true and correct copy of that letter is

21 attached hereto as ***Exhibit D***.  With that letter, I enclosed copies of Mr. Morton's engineering

22 report (Exhibit A) and Mr. Zilinki's estimate (Exhibit B).

23     15.    On April 19, 2005, having heard nothing from Ms. Singleton, I wrote to her

24 again concerning the status of her claim.  A true and correct copy of that letter is attached hereto

25 as ***Exhibit E***.  Ms. Singleton did not respond to that letter.

26     16.    In June 2005, I received an unsolicited telephone call from Emmett Construction,

27 whom Ms. Singleton had asked to bid on the reconstruction work.  Upon returning from

28

DELGADO DECLARATION IN SUPPORT OF TRAVELERS' OPPOSITION TO MOTION TO REMAND

1  vacation on July 10, 2005, I received a copy of Emmett Construction's estimate. Emmett's

2  estimate was higher than Zilinki's bid, but I was not sure why.

3       17.    Still in July 2005, I telephoned Ms. Singleton and asked to reinspect the property.

4  She said she would like to meet me there. I asked her to bring copies of any plans she had

5  submitted to local authorities and any plan check comments the authorities had made.

6       18.    Still in July 2005, I did reinspect the property and meet with Ms. Singleton at that

7  time. She did not provide me with any plans. She provided me with only partial copies of plan

8  check documents. This was the only time that Ms. Singleton met me at the site or anywhere

9  else to discuss her claim.

10       19.    After my reinspection, I was not contacted again by Emmett Construction.

11  Instead, on August 22, 2005, I received an unsolicited quote from another contractor, Snow

12  Construction. As with Emmett's estimate, I could not tell if Snow's quote was based on the

13  same scope of work that was recommended by Travelers' consultants. Snow's quote was higher

14  than Emmett Construction's estimate.

15       20.    On September 2, 2005, I sent a fax to Mr. Snow. A true and correct copy of my

16  fax is attached hereto as *Exhibit F*. Mr. Snow never responded to my fax.

17       21.    On September 13, 2005, I received by fax a letter from Kevin Dawson, a public

18  adjuster, advising that Ms. Singleton had retained him to represent her in connection with the

19  claim. Attached hereto as *Exhibit G* is a true and correct copy of that letter.

20       22.    Since receiving Mr. Dawson's letter of September 13, 2005, I have not met with

21  Ms. Singleton, nor have I spoken with her by telephone.

22       23.    Mr. Dawson never made a specific request for any additional payment on an

23  actual cash value basis, but he demanded appraisal pursuant to the terms of the policy and

24  Insurance Code § 2071. Travelers did not believe the claim was ripe for appraisal, but rather

25  than litigate the issue, Travelers submitted to the process.

26       24.    All of Travelers' payments towards Ms. Singleton's claim were made before

27  September 2007. None of Travelers' checks has named Bank of the West as a payee or co-

28  payee. The only mortgagee named in any checks was Textron. Until Mr. Singleton filed this

1  lawsuit, I was not even aware that Bank of the West had acquired the loan and is now the

2  mortgagee.

3      25.      Attached hereto as *Exhibit H* are true and correct copies of printouts of notes that

4  I recorded electronically concerning Ms. Singleton's claims.  Pursuant to Travelers' procedures

5  and California claim handling regulations, such notes are routine business reports and records

6  that I was obligated to make accurately.  I did make those notes accurately, simultaneously with

7  or very shortly after the events they memorialize, while the matters were fresh in my mind.  The

8  notes have been maintained accurately.

9

10      Executed this 14 day of May, 2008 in ＿＿＿＿＿＿, California.

11

12                          By ＿＿＿＿＿＿＿＿＿＿＿＿＿

13                              Allyson Delgado

14

10502106.1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DELGADO DECLARATION IN SUPPORT OF TRAVELERS' OPPOSITION TO MOTION TO REMAND

# EXHIBIT A

# EXHIBIT A

## 8010 Hollanda Ln.

## Dublin, CA.



## Engineering Report

### Client: St. Paul Travellers Insurance



# HOHBACH-LEWIN INC.

### STRUCTURAL ENGINEERS

116 New Montgomery St, Suite 914
San Francisco, CA 94105
Phone:(415) 318-8520
Fax:  (415) 318-8522

December 22, 2004
Hohbach-Lewin, Inc. Project 3228 – E

TRV 00058

# Table of Contents

1     Property Description ...................................................................................3
2     Purpose and Scope ....................................................................................3
3     System Description and Observation ......................................................4
   3-1    Site ...................................................................................................4
      3-1-1    Access and Egress ...........................................................4
      3-1-2    Landscaping and Appurtenances .....................................4
   3-2    Structural Frame and Building Envelope ........................................4
      3-2-1    Foundation .......................................................................4
      3-2-2    Building Frame .................................................................5
   3-3    Exterior Building Systems ...............................................................7
      3-3-1    Sidewall System ...............................................................7
      3-3-2    Windows and Exterior Doors ...........................................8
      3-3-3    Roofing ............................................................................8
   3-4    Interior Elements .............................................................................8
4     Additional Considerations ........................................................................9
   4-1    ADA Compliance .............................................................................9
5     Summary of Findings and Conclusions ..................................................10
6     Limiting Conditions .................................................................................10
     Appendix A - Field Notes .......................................................................11

TRV 00059

## 1   Property Description

The site is located at 8010 Hollanda Lane in Dublin, California.  There is one building on the property.

The structure is a single story wood framed raised floor structure with a pitched asphalt shingle roof.  Exterior walls are stucco.  Interior walls and ceilings are sheetrock.  The attached garage has been converted into a living space.  The house is founded on perimeter concrete stem walls and post and piers on the interior.  The single-family residence has been converted into a home-based daycare facility.  There is an exterior concrete slab patio with a framed cover.

## 2   Purpose and Scope

This report summarizes the findings of an engineering review conducted of the residence located at 8010 Hollanda Lane in Dublin, California.  This residence was being used as a home based daycare center at the time of the fire so the observations and recommendations that follow pertain to returning this structure to the same occupancy classification.  The objective of this report is to identify damage to the structure from a fire and what repairs are required to bring the structure back to an 'as-built' condition prior to the fire. Any code upgrades required by the City of Dublin will also be addressed.  It is our understanding based on discussions with the City of Dublin, that the code upgrade requirement is triggered when more than 50% of the structure is being modified or repaired.  The findings that follow will be broken into two parts: 1) structural items as a result of fire damage and 2) structural items as a result of the upgrade requirements.  See the attached plan sheets A1 and A2 for a layout of the building.

The following tasks have been performed: A site visit was performed to visually identify fire damage and existing structural framing members and materials where possible.  No existing drawings of the residence were available.  Building review included:

- Structural systems including foundations, structural framing and floor and roof structure.

- Exterior building systems including exterior walls, windows, and doors.

- Roofs and roofing system components.

- Interior building systems including partition walls, flooring, wall finishes, and ceiling systems.

- Rough assessment of compliance with accessibility provisions as identified in the Americans with Disabilities Act (ADA), and California Title 24.

- Preparation of this report is based on the review of readily available documentation regarding the property, on readily accessible and visible property components, and on information obtained from individuals and agencies.

The scope of work for this Engineering Report also included the following items:

- o   Approximate structural calculations to assist in assessing the quality of the lateral force resisting system.

- o   A site visit was conducted on November 22, 2004.

We have assessed the degree of conformance of the original construction to the building code in force at the time of construction, as well as current building code provisions.

**TRV 00060**

## 3   System Description and Observation

### 3-1     Site

#### 3-1-1   Access and Egress

*Description:*

Access to the site is from a driveway along Hollanda Lane and a walkway up to the structure from Hollanda Lane. Four concrete steps lead up to the home from the walkway.

*Comments:*

No observed or reported damage.   See section 4 for discussion of ADA compliance.



Picture 3-1-1A

#### 3-1-2   Landscaping and Appurtenances

*Description:*

The site is landscaped with mature trees, grass, and, shrubs. There is a wooden fence at the perimeter of the property along Hollanda Lane and Vomac Lane. There is a chain link fence on the East side of the property along Vomac Lane.

*Comments:*

No observed or reported damage.

### 3-2     Structural Frame and Building Envelope

#### 3-2-1   Foundation

*Description:*

TRV 00061

Based on site observation, the structure has perimeter concrete stem walls with interior pier footings. The residence is a raised floor structure.

**Comments:**

There was less than 18 inches of clearance from grade to the bottom of the floor girders. Access to the perimeter concrete stem walls was limited. There was some fire damage to the tongue and groove flooring, but it did not appear to be significant enough to indicate that the fire burned hot enough to damage the foundation.

Preliminary calculations indicate that the foundation is sufficient for the code minimum bearing values from Table 18-I-A and the minimums for stud bearing walls, Table 18-I-C, CBC 2001.



Picture 3-2-1A

### 3-2-2    Building Frame

**Description:**

The structure is conventional wood frame construction with floors constructed of 2x6 tongue and groove flats over 4x6 wood beams. The walls are constructed of 2x4 wood studs at 16" center-to-center. The roof is framed with 1x8 flats over 2x6 rafters at 24" center-to-center spanning to the exterior walls. The ceiling joists are 2x6 at 24" center-to-center.

TRV 00062

Picture 3-2-2A

For the vertical lateral load resisting elements in the longitudinal direction the exterior walls are made up of 2x studs braced by stucco on the exterior and ½" sheetrock on the interior.   The walls are of reasonable length, but several windows and doors have been cut into them on the south side.  It is unclear if these were added after the original construction.  In the transverse direction the exterior walls are made up of 2x studs braced by stucco on the exterior and ½" sheetrock on the interior.

The roof is sheathed with 1x8 flats that function as the horizontal lateral force resisting diaphragm.

**Comments:**

Extensive fire damage was found on the roof and ceiling members.  Substantial charring was seen on the framing and diaphragm members.   This was particularly noticeable on the east side of the structure, but damage was found on members throughout the home.  Several joists were broken and the roof was sagging.  Damaged roof and ceiling framing members will need to be replaced throughout the structure.   The floor beams appeared to be structurally undamaged, but access was limited.  The tongue and groove flooring was still partially covered by carpet and tile.  In the area that was accessible, the flat flooring was damaged, but the beam was not damaged.  We recommend that the T&G flooring be removed and replaced and that the tops of the floor beams inspected at that time and individual beams be replaced as necessary.

The front and east exterior walls of the structure will need to be replaced.  The south wall was still covered with damaged sheetrock so we were unable to determine whether the existing framing is damaged.  The west wall of the garage appeared to be structurally undamaged, but this wall also formed the back of the kitchen, where there was heavy fire damage.  Full access to this wall at the kitchen was not possible due to the remains of cabinets and appliances.  This portion of the wall may have to be removed and replaced.  Due to required code upgrades for rebuilding existing structures, we recommend that all the exterior walls be removed and replaced.

*Handwritten margin notes:*
Damaged Roof & ceiling framing members

T&G Rem & Rep.

Floor beams replaced as nec.

Frnt & Enst ext. walls need Rpl.

**TRV 00063**

The lateral force resisting system in the longitudinal direction consists of the two exterior walls only, with stucco sheathing. Due to the number and location of the window and door openings, several wall piers do not meet the 2 to 1 aspect ratio required by the code. No plywood sheathing or holdowns were used in the original construction. For the rebuilding of the structure, plywood shearwalls and holdowns will be required as shown on the attached drawings A1 and A2.

The lateral force resisting system in the transverse direction consists of the two exterior walls only. Walls are sufficient length, but no plywood or holdowns were used in the original construction. For the rebuilding of the structure, plywood shearwalls and holdowns will be required as shown on the existing drawings A1 and A2.

## 3-3    Exterior Building Systems

### 3-3-1    Sidewall System

**Description:**

The exterior walls of the building are finished with painted stucco. Visual observations at the site show this appears to be 3/8" stucco over paper and wire. The stucco has bubbled at the front of the home due to the extreme heat temperature generated by the fire. Refer to picture 3-3-1-A.



Picture 3-3-1-A

**Comments:**

The exterior walls appeared to be damaged along the north and east sides, and a portion of the south side. The stucco has bubbled and cracked on the north and east sides due to the heat of the fire. The fire burned through the sheetrock on those two sides and on a portion of the south side. Due to the fire damage discussed previously, and the required upgrades by the city for reconstruction, we recommend that the exterior walls be removed and replaced, with the new walls finished stucco similar to the existing finish.

TRV 00064

### 3-3-2    Windows and Exterior Doors

*Description:*

Windows, doors, and frames were burned or broken out prior to site observation so no description can be made.

*Comments:*

Not applicable.  See section 4 for discussion of ADA compliance.

### 3-3-3    Roofing

*Description:*

The building has a pitched asphalt shingle roof.  There are external gutters and downspouts that drain to the ground.

*Comments:*

Two large holes have been cut into the roof during the time to extinguish the fire.  The roof is sagging heavily on the east side due to the damage to the framing members.  Replacement of the roof will be required.



Picture 3-3-3A

## 3-4    Interior Elements

*Description:*

The interior walls and ceilings were finished with ½" sheetrock.  Floors were covered with either carpet or vinyl flooring.

*Comments:*

TRV 00065

Walls and ceilings have extensive fire damage. The ceiling has burned through or been removed in most of the home and the sheetrock on the walls is mostly missing except for the south wall of the home. Floor finishes are also largely unrecognizable due to the fire damage.

## 4    Additional Considerations

### 4-1    ADA Compliance

The Americans with Disabilities Act is a Federal law that requires any "place of public accommodation", which is designed and constructed for first occupancy after January 26, 1992 to be compliant with ADA requirements. Subpart C also requires an owner and/or tenant of a public accommodation, regardless of its age, to remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removal is readily achievable, i.e. easily accomplishable and able to be carried out without much difficulty or expense.

The ADA requires that any alteration to the subject site after January 26, 1992 be made to the maximum extent feasible to ensure facility access and usability by a disabled person.    "Alteration" includes remodeling renovation, rehabilitation, reconstruction, historic renovation, and changes in structural elements or walls.

It is also important to note that the ADA was enacted as a guideline for designing new buildings and was not necessarily intended to serve as a regulation for existing buildings. Therefore, implementation of certain upgrades may not necessarily be mandated due to "grandfather clauses" and/or "undue hardships" involved in satisfying ADA standards. Upgrades and/or retrofits would most likely be required only in the event of significant property remodeling, reconstruction or use/occupancy reclassification. The extent of any upgrade requirements would be subject to interpretation by any number of city, state or federal agencies.

A full ADA compliance survey was not undertaken and is out of the scope of this report. Corrections, if mandated, of these conditions should be addressed from a liability standpoint and are not considered code violations. The guidelines are civil rights issues as they pertain to the disabled.

Given the age of this facility, it is not in compliance with the current minimum ADA guidelines specifically as it relates to areas of "Public Accommodations". The following items were observed during the course of the walk-through survey and are noted. This may only be a partial list as a full compliance survey was out of the scope of this report.

- There are no designated handicapped accessible parking spaces at the property.

- There is no handicap ramp up to the front entrance.

- Doors do not have lever hardware.

- The bathroom did not meet clearance requirements nor did fixtures meet ADA provisions.

**TRV 00066**

## 5   Summary of Findings and Conclusions

In conclusion, the area of fire damage is quite extensive. The roof and ceiling joists are heavily damaged by the fire and have broken in some places and the loss of structural integrity is causing the roof to sag. Framing should be removed and replaced, and a new roof will be required. Tongue and groove flooring was damaged in the areas that were visually observable, and should be replaced. Interior and exterior walls have been fire damaged, most severely on the north and east sides of the structure. Since the extent of rebuilding is going to trigger the city code upgrade requirements, all walls should be removed and replaced to current code level requirements.

In regard to the ADA requirements, the existing structure prior to fire was not required to meet the ADA provisions. If the structure is to be rebuilt for the same occupancy, daycare E-3, then additional ADA upgrades will be required also. The extent of these upgrades is beyond the scope of this report.

## 6   Limiting Conditions

This report represents a statement of the physical condition of the building and property based upon visual site observation, professional analysis and judgment, and is current only as of the date of the site observation. We have performed our services and prepared this report in accordance with generally accepted construction consulting practices but it is not the intent of this report to provide architecture or engineering services.

The report is not to be construed as a warranty or guarantee of future building conditions, an estimate of value or a guarantee that the building is in compliance with any federal, state, or local statute, ordinance, rule, or regulation including, but not limited to, building codes, safety codes, environmental regulations, health codes or zoning ordinances or compliance with trade/design standards or the standards developed by the insurance industry; however, any conspicuous violations observed by the field observer have been identified.

This report applies only to those portions of the property and/or items and equipment that were capable of being visually observed. Unless otherwise noted in this report, no invasive or destructive testing was performed. Walls and ceilings were not opened to observe hidden or concealed conditions. In addition, no sampling was conducted of any property components. Drawings and specifications were available only to the extent described in the report.

The scope of this report did not include any investigation of environmental conditions at the subject property site and building. No representation is made as to the property being free of toxic materials. In addition, no representation is made as to the presence of termite or insect infestation. No representation is made as to the title, legality of lots or zoning, nor is any representation made as to the advisability or inadvisability of, purchase of, investment in, or financing of said property. Conditions, codes, covenants and restrictions which may be part of the legal deed of title to the property and which may vary in description of property boundaries, easements or dedications have not been disclosed or reviewed.

This report contains proprietary and confidential information and is prepared exclusively for the internal use of our client, their officers and employees. Any dissemination, reproduction, use, reliance upon, or transmission of the information contained in this report to any entity other than our client is expressly prohibited without the written consent of Hohbach-Lewin Structural Engineers.

**TRV 00067**

# Appendix A – Field Notes

8010 Hollanda Ln., Dublin, CA.

Roof and framing – Heavy charring throughout, most heavily damaged at east end of home. Some cracked members. Roof is sagging at east side front of home and temporarily braced up. 2x6 at 24" on center. Asphalt shingle roof, pitched to approximately 3:12 or 4:12. Single ridge beam running length of house from left to right. Framing at garage appears to be in fairly good shape, some smoke damage and minor charring.

Ceiling and framing – Heavy charring throughout, most heavily damaged at the east end of the home. Ceiling finish has been burned and destroyed throughout. See some remnants of ½" gypsum board at some screws into the studs. 2x6 at 24" on center. Bear on left right running wall or 4x10 beam. Framing at garage appears to be in fairly good shape, some smoke damage and minor charring.

Floor and framing – Fire burned down to 2x6 flat tongue and groove floor at the front east room. Some evidence of carpet an/or vinyl tile over floor members. 4x6 floor beams, approximately 16 crawlspace between top of grade and bottom of floor beam.

Wall framing – Front and east walls are most heavily damaged with fire burning through the sheetrock and charring the studs. Back wall still had sheetrock on the studs. Garage wall studs appeared to be in good shape.

Stucco exterior was cracked and bubbled at the front of the home.

Two holes cut into the roof, probably when fire was being fought.

**TRV 00068**

HOHBACH-LEWIN, INC.
STRUCTURAL ENGINEERS
260 Sheridan Avenue,
Suite 150
Palo Alto, CA 94306
650-853-8000 650-853-8001

A.2

Drawing

3228

Number

RESIDENCE / DAYCARE

Project

6010 Holanda Ln.

Title

Scale

Date
06-06-04

2 of 2





N

**ROOF PLAN**      1/8"=1'-0"

Office (2)          Office (1)          Class room 3

Bathroom 3          Bathroom 1

Class room 2        Class room 1

Garage

TRV 00069

FLOOR PLAN

1/8"=1'-0"



TRV 00070



**HOHBACH-LEWIN, INC.**
STRUCTURAL ENGINEERS
260 Sheridan Avenue,    Suite 150
Palo Alto, CA 94306
(650) 617-5930,  Fax (650) 617-5932

| Project | | Number |
|---|---|---|
| RESIDENCE / DAYCARE | | 3228 |
| Title | | |
| 8010 Holanda Ln. | | |
| Scale | | Date |
| Dublin, CA 94568 | | 12-06-04 |

Drawing

**A.1**

1 of 2

# EXHIBIT B

# EXHIBIT B



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

**2004-11-22-0959**

**Main Level**

**Area Items: Main Level**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Stud wall - 2" x 4" x 8' - 16" oc | 113.17 LF | 1.55 | 0.00 | 175.41 |
| Stud wall - 2" x 4" x 8' - 16" oc | 113.17 LF | 0.00 | 17.42 | 1,971.36 |

| Area Items Total: Main Level | | | | 2,146.77 |
|---|---|---|---|---|



**Room: DINING**

| | |
|---|---|
| 200.50  SF Walls | 109.48  SF Ceiling |
| 309.98  SF Walls & Ceiling | 109.48  SF Floor |
| 12.16  SY Flooring | 29.33  LF Floor Perimeter |
| 22.50  LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 109.48 SF | 0.00 | 1.22 | 133.56 |
| Vinyl floor covering (sheet goods) | 109.48 SF | 0.00 | 3.48 | 380.99 |
| Cove base molding - rubber or vinyl, 4" high | 29.33 LF | 0.00 | 1.38 | 40.48 |
| 1/2" drywall - hung, taped, floated, ready for paint | 309.98 SF | 0.00 | 1.62 | 502.17 |
| Rewire - average residence - copper wiring | 109.48 SF | 0.00 | 3.70 | 405.07 |
| Outlet or switch | 2.00 EA | 0.00 | 10.98 | 21.96 |
| Fluorescent - two tube - 4' - strip light | 1.00 EA | 0.00 | 67.00 | 67.00 |
| R&R Exterior door - metal - insulated / wood - High grade | 1.00 EA | 19.31 | 339.71 | 359.02 |
| R&R Casing - 2 1/4" | 20.00 LF | 0.45 | 1.61 | 41.20 |
| Door lockset & deadbolt - exterior | 1.00 EA | 0.00 | 74.08 | 74.08 |
| Paint door or window opening - 2 coats (per side) | 2.00 EA | 0.00 | 20.95 | 41.90 |
| Cabinetry - upper (wall) units | 8.00 LF | 0.00 | 141.74 | 1,133.92 |
| Blown-in insulation - 10" depth - R30 | 109.48 SF | 0.00 | 0.74 | 81.01 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 109.48 SF | 0.00 | 2.45 | 268.22 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 109.48 SF | 0.00 | 2.45 | 268.22 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 109.48 SF | 0.00 | 2.11 | 231.00 |
| Seal stud wall for odor control | 200.50 SF | 0.00 | 0.57 | 114.29 |
| Seal then paint the walls and ceiling (2 coats) | 309.98 SF | 0.00 | 0.66 | 204.59 |

| Room Totals: DINING | | | | 4,368.68 |
|---|---|---|---|---|

TRV 00072



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003



## Room: KITCHEN

| | | | |
|---|---|---|---|
| 231.01 | SF Walls | 81.99 | SF Ceiling |
| 313.00 | SF Walls & Ceiling | 81.99 | SF Floor |
| 9.11 | SY Flooring | 35.02 | LF Floor Perimeter |
| 28.19 | LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 81.99 SF | 0.00 | 1.22 | 100.03 |
| Floor preparation for sheet goods | 81.99 SF | 0.00 | 0.48 | 39.36 |
| Vinyl floor covering (sheet goods) | 81.99 SF | 0.00 | 3.48 | 285.33 |
| Cove base molding - rubber or vinyl, 4" high | 35.02 LF | 0.00 | 1.38 | 48.33 |
| Carpet - metal transition strip | 4.00 LF | 0.00 | 2.29 | 9.16 |
| Cabinetry - lower (base) units - High grade | 15.83 LF | 0.00 | 222.28 | 3,519.43 |
| Angle stop | 3.00 EA | 0.00 | 24.24 | 72.72 |
| Plumbing fixture supply line | 1.00 EA | 0.00 | 12.42 | 12.42 |
| P-trap assembly - ABS (plastic) | 1.00 EA | 0.00 | 40.63 | 40.63 |
| Garbage disposer | 1.00 EA | 0.00 | 161.18 | 161.18 |
| Sink - double | 1.00 EA | 0.00 | 256.91 | 256.91 |
| Sink faucet - Kitchen | 1.00 EA | 0.00 | 119.90 | 119.90 |
| Countertop - Flat laid plastic laminate | 17.83 LF | 0.00 | 29.90 | 533.22 |
| 4" backsplash for flat laid countertop | 17.83 LF | 0.00 | 7.13 | 127.15 |
| Range - 30" - gas | 1.00 EA | 0.00 | 503.58 | 503.58 |
| Refrigerator - 18 cf | 1.00 EA | 0.00 | 630.97 | 630.97 |
| Dishwasher | 1.00 EA | 0.00 | 392.68 | 392.68 |
| Cabinetry - upper (wall) units | 18.75 LF | 0.00 | 141.74 | 2,657.63 |
| Light fixture | 1.00 EA | 0.00 | 49.68 | 49.68 |
| Microwave oven - over range w/built-in hood | 1.00 EA | 0.00 | 483.05 | 483.05 |
| Rewire - average residence - copper wiring | 81.99 SF | 0.00 | 3.70 | 303.37 |
| Outlet or switch | 7.00 EA | 0.00 | 10.98 | 76.86 |
| Cafe doors - Louvered pair - up to 36" wide | 1.00 EA | 0.00 | 218.21 | 218.21 |
| Wood door - oak face, fire rated (mineral fiber core) | 1.00 EA | 0.00 | 335.17 | 335.17 |
| Door lockset - interior | 1.00 EA | 0.00 | 34.13 | 34.13 |
| 1/2" drywall - hung, taped, floated, ready for paint | 313.00 SF | 0.00 | 1.62 | 507.06 |
| Blown-in insulation - 10" depth - R30 | 81.99 SF | 0.00 | 0.74 | 60.67 |
| Seal then paint the walls and ceiling (2 coats) | 313.00 SF | 0.00 | 0.66 | 206.58 |
| Paint door or window opening - 2 coats (per side) | 2.00 EA | 0.00 | 20.95 | 41.90 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 81.99 SF | 0.00 | 2.45 | 200.88 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 81.99 SF | 0.00 | 2.45 | 200.88 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 81.99 SF | 0.00 | 2.11 | 173.00 |

**TRV 00073**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

## CONTINUED - KITCHEN

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal stud wall for odor control | 231.01 SF | 0.00 | 0.57 | 131.68 |
| **Room Totals: KITCHEN** | | | | **12,533.75** |



**Room: Class room 2**

| 317.25 SF Walls | 252.66 SF Ceiling |
|---|---|
| 569.91 SF Walls & Ceiling | 252.66 SF Floor |
| 28.07 SY Flooring | 43.00 LF Floor Perimeter |
| 56.42 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 252.66 SF | 0.00 | 1.22 | 308.25 |
| Carpet pad | 47.64 SF | 0.00 | 0.45 | 21.44 |
| Loop pile carpet - 36 oz. | 47.64 SF | 0.00 | 2.26 | 107.66 |
| Vinyl floor covering (sheet goods) | 205.03 SF | 0.00 | 3.48 | 713.50 |
| Cove base molding - rubber or vinyl, 4" high | 43.00 LF | 0.00 | 1.38 | 59.34 |
| Trim board - 1" x 4" - installed (pine) | 10.00 LF | 0.00 | 2.64 | 26.40 |
| 1/2" drywall - hung, taped, floated, ready for paint | 569.91 SF | 0.00 | 1.62 | 923.25 |
| Rewire - average residence - copper wiring | 252.66 SF | 0.00 | 3.70 | 934.86 |
| Outlet or switch | 3.00 EA | 0.00 | 10.98 | 32.94 |
| Fluorescent - two tube - 4' - strip light | 2.00 EA | 0.00 | 67.00 | 134.00 |
| Paint door or window opening - 2 coats (per side) | 3.00 EA | 0.00 | 20.95 | 62.85 |
| Seal then paint the walls and ceiling (2 coats) | 569.91 SF | 0.00 | 0.66 | 376.14 |
| Paint door slab only - 2 coats (per side) | 1.00 EA | 0.00 | 20.18 | 20.18 |
| Casing - 2 1/4" | 20.00 LF | 0.00 | 1.61 | 32.20 |
| Cabinetry - upper (wall) units | 7.58 LF | 0.00 | 141.74 | 1,074.86 |
| Blown-in insulation - 10" depth - R30 | 252.66 SF | 0.00 | 0.74 | 186.97 |
| Carpet - metal transition strip | 17.00 LF | 0.00 | 2.29 | 38.93 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 252.66 SF | 0.00 | 2.45 | 619.03 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 252.66 SF | 0.00 | 2.45 | 619.03 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 252.66 SF | 0.00 | 2.11 | 533.12 |

2004-11-22-0959

**TRV 00074**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

## CONTINUED - Class room 2

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal stud wall for odor control | 317.25 SF | 0.00 | 0.57 | 180.83 |

| Room Totals: Class room 2 | | | | 7,005.78 |
|---|---|---|---|---|

### Room: Bathroom2



| | | |
|---|---|---|
| 200.01 | SF Walls | 37.40  SF Ceiling |
| 237.41 | SF Walls & Ceiling | 37.40  SF Floor |
| 4.16 | SY Flooring | 25.00  LF Floor Perimeter |
| 25.00 | LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 37.40 SF | 0.00 | 1.22 | 45.63 |
| Floor preparation for sheet goods | 37.40 SF | 0.00 | 0.48 | 17.95 |
| Vinyl floor covering (sheet goods) | 37.40 SF | 0.00 | 3.48 | 130.15 |
| Cove base molding - rubber or vinyl, 4" high | 25.00 LF | 0.00 | 1.38 | 34.50 |
| Carpet - metal transition strip | 3.00 LF | 0.00 | 2.29 | 6.87 |
| Laundry tub | 1.00 EA | 0.00 | 203.27 | 203.27 |
| Angle stop | 3.00 EA | 0.00 | 24.24 | 72.72 |
| Plumbing fixture supply line | 3.00 EA | 0.00 | 12.42 | 37.26 |
| P-trap assembly - ABS (plastic) | 1.00 EA | 0.00 | 40.63 | 40.63 |
| Toilet | 1.00 EA | 0.00 | 284.27 | 284.27 |
| Toilet seat | 1.00 EA | 0.00 | 30.32 | 30.32 |
| Toilet paper holder | 1.00 EA | 0.00 | 22.75 | 22.75 |
| Sink faucet - Kitchen | 1.00 EA | 0.00 | 119.90 | 119.90 |
| Medicine cabinet | 1.00 EA | 0.00 | 119.60 | 119.60 |
| Light fixture | 1.00 EA | 0.00 | 49.68 | 49.68 |
| Rewire - average residence - copper wiring | 37.40 SF | 0.00 | 3.70 | 138.37 |
| Outlet or switch | 2.00 EA | 0.00 | 10.98 | 21.96 |
| Interior door unit | 1.00 EA | 0.00 | 151.22 | 151.22 |
| Door lockset - interior | 1.00 EA | 0.00 | 34.13 | 34.13 |
| Waterproof paneling w/trim - High grade | 100.01 SF | 0.00 | 2.40 | 240.01 |
| 1/2" drywall - hung, taped, floated, ready for paint | 237.41 SF | 0.00 | 1.62 | 384.60 |
| Blown-in insulation - 10" depth - R30 | 37.40 SF | 0.00 | 0.74 | 27.67 |
| Shelving - 24" - in place | 28.00 LF | 0.00 | 9.31 | 260.68 |

**TRV 00075**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

### CONTINUED - Bathroom2

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal then paint the walls and ceiling (2 coats) | 237.41 SF | 0.00 | 0.66 | 156.69 |
| Paint door or window opening - 2 coats (per side) | 1.00 EA | 0.00 | 20.95 | 20.95 |
| Seal & paint wood shelving, 12"- 24" width | 28.00 LF | 0.00 | 2.43 | 68.04 |
| Towel bar - High grade | 1.00 EA | 0.00 | 29.36 | 29.36 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 37.40 SF | 0.00 | 2.45 | 91.63 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 37.40 SF | 0.00 | 2.45 | 91.63 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 37.40 SF | 0.00 | 2.11 | 78.91 |
| Seal stud wall for odor control | 100.01 SF | 0.00 | 0.57 | 57.00 |
| **Room Totals: Bathroom2** | | | | **3,068.35** |



### Room: Bathroom1

| | |
|---|---|
| 241.34  SF Walls | 56.88  SF Ceiling |
| 298.23  SF Walls & Ceiling | 56.88  SF Floor |
| 6.32  SY Flooring | 30.17  LF Floor Perimeter |
| 30.17  LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 56.88 SF | 0.00 | 1.22 | 69.40 |
| Floor preparation for sheet goods | 56.88 SF | 0.00 | 0.48 | 27.30 |
| Vinyl floor covering (sheet goods) | 56.88 SF | 0.00 | 3.48 | 197.95 |
| Cove base molding - rubber or vinyl, 4" high | 30.17 LF | 0.00 | 1.38 | 41.63 |
| Carpet - metal transition strip | 6.00 LF | 0.00 | 2.29 | 13.74 |
| Trim board - 1" x 10" - installed (pine) | 15.17 LF | 0.00 | 5.46 | 82.81 |
| Angle stop | 9.00 EA | 0.00 | 24.24 | 218.16 |
| Plumbing fixture supply line | 9.00 EA | 0.00 | 12.42 | 111.78 |
| P-trap assembly - ABS (plastic) | 3.00 EA | 0.00 | 40.63 | 121.89 |
| Toilet | 3.00 EA | 0.00 | 284.27 | 852.81 |
| Toilet seat | 3.00 EA | 0.00 | 30.32 | 90.96 |
| Toilet paper holder | 3.00 EA | 0.00 | 22.75 | 68.25 |
| Sink - single | 3.00 EA | 0.00 | 140.86 | 422.58 |
| Sink faucet - Bathroom | 4.00 EA | 0.00 | 100.10 | 400.40 |
| Countertop - post formed plastic laminate | 7.58 LF | 0.00 | 35.80 | 271.48 |
| 4" backsplash for flat laid countertop | 4.00 LF | 0.00 | 7.13 | 28.52 |

TRV 00076



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

### CONTINUED - Bathroom1

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Cabinetry - upper (wall) units | 4.50 LF | 0.00 | 141.74 | 637.83 |
| Light fixture | 1.00 EA | 0.00 | 49.68 | 49.68 |
| Bathroom fan, light, and heater | 1.00 EA | 0.00 | 153.52 | 153.52 |
| Rewire - average residence - copper wiring | 56.88 SF | 0.00 | 3.70 | 210.46 |
| Outlet or switch | 2.00 EA | 0.00 | 10.98 | 21.96 |
| Exterior door - Dutch - pre-hung unit | 1.00 EA | 0.00 | 564.94 | 564.94 |
| Interior door unit | 1.00 EA | 0.00 | 151.22 | 151.22 |
| Door lockset - interior | 2.00 EA | 0.00 | 34.13 | 68.26 |
| Waterproof paneling w/trim - High grade | 90.50 SF | 0.00 | 2.40 | 217.21 |
| 1/2" drywall - hung, taped, floated, ready for paint | 298.23 SF | 0.00 | 1.62 | 483.13 |
| Blown-in insulation - 10" depth - R30 | 56.88 SF | 0.00 | 0.74 | 42.09 |
| Seal then paint the walls and ceiling (2 coats) | 298.23 SF | 0.00 | 0.66 | 196.83 |
| Paint door or window opening - 2 coats (per side) | 2.00 EA | 0.00 | 20.95 | 41.90 |
| Seal & paint trim | 7.58 LF | 0.00 | 0.97 | 7.36 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 56.88 SF | 0.00 | 2.45 | 139.36 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 56.88 SF | 0.00 | 2.45 | 139.36 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 56.88 SF | 0.00 | 2.11 | 120.02 |
| Seal stud wall for odor control | 120.67 SF | 0.00 | 0.57 | 68.78 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 20.18 | 40.36 |
| **Room Totals: Bathroom1** | | | | **6,373.93** |



### Room: Class room 3

|  | |  | |
|---|---|---|---|
| 925.40 | SF Walls | 483.14 | SF Ceiling |
| 1,408.54 | SF Walls & Ceiling | 483.14 | SF Floor |
| 53.68 | SY Flooring | 117.71 | LF Floor Perimeter |
| 150.44 | LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 483.14 SF | 0.00 | 1.22 | 589.43 |
| Carpet pad | 295.64 SF | 0.00 | 0.45 | 133.04 |
| Loop pile carpet - 36 oz. | 295.64 SF | 0.00 | 2.26 | 668.15 |
| Vinyl floor covering (sheet goods) | 187.50 SF | 0.00 | 3.48 | 652.50 |

**TRV 00077**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

## CONTINUED - Class room 3

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Baseboard - 3 1/4" | 117.71 LF | 0.00 | 2.50 | 294.28 |
| 1/2" drywall - hung, taped, floated, ready for paint | 1,408.54 SF | 0.00 | 1.62 | 2,281.83 |
| Rewire - average residence - copper wiring | 483.14 SF | 0.00 | 3.70 | 1,787.63 |
| Outlet or switch | 10.00 EA | 0.00 | 10.98 | 109.80 |
| Fluorescent - two tube - 4' - strip light | 3.00 EA | 0.00 | 67.00 | 201.00 |
| Exterior door - metal - insulated / wood - High grade | 1.00 EA | 0.00 | 339.71 | 339.71 |
| Interior door unit | 2.00 EA | 0.00 | 151.22 | 302.44 |
| Door lockset & deadbolt - exterior | 1.00 EA | 0.00 | 74.08 | 74.08 |
| Door lockset - interior | 2.00 EA | 0.00 | 34.13 | 68.26 |
| Paint door or window opening - 2 coats (per side) | 8.00 EA | 0.00 | 20.95 | 167.60 |
| Paint door slab only - 2 coats (per side) | 5.00 EA | 0.00 | 20.18 | 100.90 |
| Prime & paint door slab only - exterior (per side) | 1.00 EA | 0.00 | 30.41 | 30.41 |
| Paint baseboard - two coats | 117.71 LF | 0.00 | 0.97 | 114.18 |
| Casing - 2 1/4" | 120.00 LF | 0.00 | 1.61 | 193.20 |
| Blown-in insulation - 10" depth - R30 | 483.14 SF | 0.00 | 0.74 | 357.53 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 483.14 SF | 0.00 | 2.45 | 1,183.70 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 483.14 SF | 0.00 | 2.11 | 1,019.43 |
| Seal then paint the walls and ceiling (2 coats) | 1,408.54 SF | 0.00 | 0.66 | 929.63 |
| **Room Totals: Class room 3** | | | | **11,598.73** |



## Room: Class Room 1

| | |
|---|---|
| 308.76  SF Walls | 210.24  SF Ceiling |
| 519.00  SF Walls & Ceiling | 210.24  SF Floor |
| 23.36  SY Flooring | 39.27  LF Floor Perimeter |
| 58.86  LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 210.24 SF | 0.00 | 1.22 | 256.50 |
| Carpet pad | 158.99 SF | 0.00 | 0.45 | 71.55 |
| Loop pile carpet - 36 oz. | 158.99 SF | 0.00 | 2.26 | 359.33 |
| Vinyl floor covering (sheet goods) | 51.25 SF | 0.00 | 3.48 | 178.35 |

2004-11-22-0959

TRV 00078



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

### CONTINUED - Class Room 1

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Baseboard - 3 1/4" | 39.27 LF | 0.00 | 2.50 | 98.18 |
| 1/2" drywall - hung, taped, floated, ready for paint | 519.00 SF | 0.00 | 1.62 | 840.78 |
| Rewire - average residence - copper wiring | 210.24 SF | 0.00 | 3.70 | 777.90 |
| Outlet or switch | 5.00 EA | 0.00 | 10.98 | 54.90 |
| Fluorescent - two tube - 4' - strip light | 1.00 EA | 0.00 | 67.00 | 67.00 |
| Exterior door - metal - insulated / wood - High grade | 1.00 EA | 0.00 | 339.71 | 339.71 |
| Wood door - lauan face, fire rated (mineral fiber core) | 1.00 EA | 0.00 | 328.22 | 328.22 |
| Door lockset & deadbolt - exterior | 1.00 EA | 0.00 | 74.08 | 74.08 |
| Door lockset - interior | 1.00 EA | 0.00 | 34.13 | 34.13 |
| Paint door or window opening - 2 coats (per side) | 4.00 EA | 0.00 | 20.95 | 83.80 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 20.18 | 40.36 |
| Prime & paint door slab only - exterior (per side) | 1.00 EA | 0.00 | 30.41 | 30.41 |
| Paint baseboard - two coats | 39.27 LF | 0.00 | 0.97 | 38.09 |
| Casing - 2 1/4" | 60.00 LF | 0.00 | 1.61 | 96.60 |
| Shelving - 12" - in place | 3.00 LF | 0.00 | 7.40 | 22.20 |
| Cabinetry - upper (wall) units | 2.00 LF | 0.00 | 141.74 | 283.48 |
| Blown-in insulation - 10" depth - R30 | 210.24 SF | 0.00 | 0.74 | 155.58 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 210.24 SF | 0.00 | 2.45 | 515.10 |
| Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 210.24 SF | 0.00 | 2.45 | 515.10 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 210.24 SF | 0.00 | 2.11 | 443.61 |
| Seal then paint the walls and ceiling (2 coats) | 519.00 SF | 0.00 | 0.66 | 342.54 |
| Seal stud wall for odor control | 154.38 SF | 0.00 | 0.57 | 88.00 |
| **Room Totals: Class Room 1** | | | | **6,135.50** |



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003



## Room: Garage

| | | | |
|---|---|---|---|
| 612.34 | SF Walls | 351.30 | SF Ceiling |
| 963.65 | SF Walls & Ceiling | 351.30 | SF Floor |
| 39.03 | SY Flooring | 78.67 | LF Floor Perimeter |
| 78.67 | LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Underlayment - 3/8" particle board | 184.19 SF | 0.00 | 1.22 | 224.72 |
| Carpet pad | 167.11 SF | 0.00 | 0.45 | 75.20 |
| Loop pile carpet - 36 oz. | 167.11 SF | 0.00 | 2.26 | 377.66 |
| Vinyl floor covering (sheet goods) | 184.19 SF | 0.00 | 3.48 | 641.00 |
| Baseboard - 3 1/4" | 78.67 LF | 0.00 | 2.50 | 196.67 |
| Cabinetry - lower (base) units | 6.00 LF | 0.00 | 160.24 | 961.44 |
| Angle stop | 3.00 EA | 0.00 | 24.24 | 72.72 |
| Plumbing fixture supply line | 3.00 EA | 0.00 | 12.42 | 37.26 |
| P-trap assembly - ABS (plastic) | 1.00 EA | 0.00 | 40.63 | 40.63 |
| Sink faucet - Bathroom | 2.00 EA | 0.00 | 100.10 | 200.20 |
| Vanity top - one sink - cultured marble | 3.00 LF | 0.00 | 83.13 | 249.39 |
| 5/8" drywall - hung, taped, floated, ready for paint | 963.65 SF | 0.00 | 1.81 | 1,744.20 |
| Rewire - average residence - copper wiring | 351.30 SF | 0.00 | 3.70 | 1,299.82 |
| Outlet or switch | 2.00 EA | 0.00 | 10.98 | 21.96 |
| Breaker panel - 100 amp | 1.00 EA | 0.00 | 582.50 | 582.50 |
| Cold air return cover | 1.00 EA | 0.00 | 23.65 | 23.65 |
| Light fixture | 2.00 EA | 0.00 | 49.68 | 99.36 |
| Exterior door - metal - insulated / wood - High grade | 1.00 EA | 0.00 | 339.71 | 339.71 |
| Door lockset & deadbolt - exterior | 1.00 EA | 0.00 | 74.08 | 74.08 |
| Paint door or window opening - 2 coats (per side) | 4.00 EA | 0.00 | 20.95 | 83.80 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 20.18 | 40.36 |
| Prime & paint door slab only - exterior (per side) | 1.00 EA | 0.00 | 30.41 | 30.41 |
| Paint baseboard - two coats | 78.67 LF | 0.00 | 0.97 | 76.31 |
| Casing - 2 1/4" | 60.00 LF | 0.00 | 1.61 | 96.60 |
| Cabinetry - upper (wall) units | 19.58 LF | 0.00 | 141.74 | 2,775.74 |
| Blown-in insulation - 10" depth - R30 | 351.30 SF | 0.00 | 0.74 | 259.96 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 351.30 SF | 0.00 | 2.11 | 741.25 |
| Hip or roof intersection  4/12 slope (hip/valley length) | 30.00 LF | 0.00 | 60.89 | 1,826.70 |
| R&R Heat/AC register | 1.00 EA | 1.26 | 19.34 | 20.60 |
| Seal stud wall for odor control | 612.34 SF | 0.00 | 0.57 | 349.04 |
| **Room Totals: Garage** | | | | **13,562.94** |

2004-11-22-0959

**TRV 00080**



## Walter M. Springs Construction

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003



### Room: MECH

| | |
|---|---|
| 117.34  SF Walls | 12.68  SF Ceiling |
| 130.03  SF Walls & Ceiling | 12.68  SF Floor |
| 1.41  SY Flooring | 14.67  LF Floor Perimeter |
| 14.67  LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| 5/8" drywall - hung, taped, floated, ready for paint | 130.03 SF | 0.00 | 1.81 | 235.35 |
| Furnace - forced air - high efficiency - 100,000 BTU | 1.00 EA | 0.00 | 1,936.61 | 1,936.61 |
| Central air conditioning system - 3 ton | 1.00 EA | 0.00 | 1,848.42 | 1,848.42 |
| Furnace vent - double wall, 5" | 12.00 LF | 0.00 | 19.72 | 236.64 |
| Furnace vent - aluminum, 3" | 4.00 LF | 0.00 | 6.72 | 26.88 |
| Water heater - 40 gallon - Gas | 1.00 EA | 0.00 | 505.04 | 505.04 |
| Interior door unit | 2.00 EA | 0.00 | 151.22 | 302.44 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 20.18 | 40.36 |
| Rafters - 2x6 - 24" OC (3-5/12 Gable, per SF of floor) | 12.68 SF | 0.00 | 2.11 | 26.76 |
| **Room Totals: MECH** | | | | **5,158.50** |
| **Area Items Total:  Main Level** | | | | **71,952.93** |

**TRV 00081**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

## Roof



### Room: Roof1

| | | | |
|---|---|---|---|
| 1,709.97 | Surface Area | 17.10 | Number of Squares |
| 160.15 | Total Perimeter Length | 58.50 | Total Ridge Length |
| 0.00 | Total Hip Length | 899.27 | Area of Face 1 |
| 810.70 | Area of Face 2 | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Flashing - pipe jack | 6.00 EA | 0.00 | 21.06 | 126.36 |
| Furnace vent - rain cap and storm collar, 6" | 4.00 EA | 0.00 | 36.09 | 144.36 |
| Sheathing - plywood - 1/2" CDX | 1,709.97 SF | 0.00 | 1.45 | 2,479.45 |
| 3 tab - 25 yr. - (hvy.wt) comp. shingle rfg - incl. felt | 17.10 SQ | 0.00 | 226.69 | 3,876.32 |
| Ridge cap - composition shingles | 58.50 LF | 0.00 | 2.00 | 117.00 |
| Flashing, 20" wide | 20.00 LF | 0.00 | 2.71 | 54.20 |
| Flashing, 20" wide | 30.00 LF | 0.00 | 2.71 | 81.30 |
| **Room Totals: Roof1** | | | | **6,878.99** |



### Room: Roof2

| | | | |
|---|---|---|---|
| 164.26 | Surface Area | 1.64 | Number of Squares |
| 27.16 | Total Perimeter Length | 13.08 | Total Ridge Length |
| 0.00 | Total Hip Length | 82.13 | Area of Face 1 |
| 82.13 | Area of Face 2 | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Sheathing - plywood - 1/2" CDX | 164.26 SF | 0.00 | 1.45 | 238.18 |
| 3 tab - 25 yr. - (hvy.wt) comp. shingle rfg - incl. felt | 1.64 SQ | 0.00 | 226.69 | 372.37 |
| Ridge cap - composition shingles | 13.08 LF | 0.00 | 2.00 | 26.17 |
| **Room Totals: Roof2** | | | | **636.72** |
| **Area Items Total:  Roof** | | | | **7,515.71** |

2004-11-22-0959

12/27/2004   Page: 11

**TRV 00082**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003



### Room: Right Elevation

**Formula Elevation 33'0" x ... x 8'0"**

| | | | |
|---|---|---|---|
| 379.50 | SF Walls | 0.00 | SF Ceiling |
| 0.00 | SF Walls & Ceiling | 0.00 | SF Floor |
| 0.00 | SY Flooring | 33.00 | LF Floor Perimeter |
| 379.50 | SF Long Wall | 379.50 | SF Short Wall |
| 35.85 | LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Metal lath & stucco | 379.50 SF | 0.00 | 4.89 | 1,855.76 |
| Breaker panel - 70 amp | 1.00 EA | 0.00 | 473.65 | 473.65 |
| Gutter / downspout - aluminum | 24.00 LF | 0.00 | 4.02 | 96.48 |
| 2" x 8" lumber (1.33 BF per LF)- varge rafters | 40.00 EA | 0.00 | 3.55 | 142.00 |
| Seal & paint stucco | 379.50 SF | 0.00 | 0.93 | 352.94 |
| Prime & paint exterior soffit - exposed rafters | 40.00 SF | 0.00 | 2.08 | 83.20 |
| **Room Totals: Right Elevation** | | | | **3,004.03** |



### Room: Front Elevation

**Formula Elevation 18'0" x ... x 9'3"**

| | | | |
|---|---|---|---|
| 189.00 | SF Walls | 0.00 | SF Ceiling |
| 0.00 | SF Walls & Ceiling | 0.00 | SF Floor |
| 0.00 | SY Flooring | 18.00 | LF Floor Perimeter |
| 189.00 | SF Long Wall | 189.00 | SF Short Wall |
| 18.68 | LF Ceil. Perimeter | | |



### Subroom 1: offset

**Formula Elevation 6'10" x ... x 9'3"**

| | | | |
|---|---|---|---|
| 63.21 | SF Walls | 0.00 | SF Ceiling |
| 0.00 | SF Walls & Ceiling | 0.00 | SF Floor |
| 0.00 | SY Flooring | 6.83 | LF Floor Perimeter |
| 63.21 | SF Long Wall | 63.21 | SF Short Wall |
| 6.83 | LF Ceil. Perimeter | | |

**TRV 00083**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003



## Subroom 2: offset2

### Formula Elevation 16'10" x ... x 9'3"

| | | | |
|---|---|---|---|
| 155.71 | SF Walls | 0.00 | SF Ceiling |
| 0.00 | SF Walls & Ceiling | 0.00 | SF Floor |
| 0.00 | SY Flooring | 16.83 | LF Floor Perimeter |
| 155.71 | SF Long Wall | 155.71 | SF Short Wall |
| 16.83 | LF Ceil. Perimeter | | |



## Subroom 3: offset3

### Formula Elevation 23'3" x ... x 9'3"

| | | | |
|---|---|---|---|
| 215.06 | SF Walls | 0.00 | SF Ceiling |
| 0.00 | SF Walls & Ceiling | 0.00 | SF Floor |
| 0.00 | SY Flooring | 23.25 | LF Floor Perimeter |
| 215.06 | SF Long Wall | 215.06 | SF Short Wall |
| 23.25 | LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Metal lath & stucco | 622.98 SF | 0.00 | 4.89 | 3,046.37 |
| Gutter / downspout - aluminum | 20.00 LF | 0.00 | 4.02 | 80.40 |
| 2" x 8" lumber (1.33 BF per LF)- varge rafters | 64.00 EA | 0.00 | 3.55 | 227.20 |
| Fascia - 1" x 8" #1 pine | 40.08 LF | 0.00 | 5.35 | 214.45 |
| Shutters - wood - louvered or paneled | 4.00 EA | 0.00 | 248.22 | 992.88 |
| 2" x 4" lumber - redwood (.667 BF per LF) | 21.00 LF | 0.00 | 2.25 | 47.25 |
| Trim board - 1" x 4" - installed (redwood) | 14.00 LF | 0.00 | 3.97 | 55.58 |
| Vinyl window, horizontal sliding, 24-32 sf - High grade | 4.00 EA | 0.00 | 357.00 | 1,428.00 |
| Spot light fixture - double - w/motion sensor | 1.00 EA | 0.00 | 145.49 | 145.49 |
| Exterior light fixture | 1.00 EA | 0.00 | 70.09 | 70.09 |
| Wall mount mailbox | 1.00 EA | 0.00 | 31.23 | 31.23 |
| Flag pole 3/4" dia 5' long | 1.00 EA | 0.00 | 41.28 | 41.28 |
| Seal & paint stucco | 622.98 SF | 0.00 | 0.93 | 579.37 |
| Paint door or window opening - 2 coats (per side) | 5.00 EA | 0.00 | 20.95 | 104.75 |
| Seal & paint double garage door opening & trim | 1.00 EA | 0.00 | 85.02 | 85.02 |
| Prime & paint exterior soffit - exposed rafters | 34.83 SF | 0.00 | 2.08 | 72.45 |
| Prime & paint gutter / downspout | 66.92 LF | 0.00 | 1.12 | 74.95 |
| Indoor / outdoor carpet | 51.67 SF | 0.00 | 1.53 | 79.05 |
| Step charge for "waterfall" carpet installation | 4.00 EA | 0.00 | 6.35 | 25.40 |
| **Room Totals: Front Elevation** | | | | **7,401.21** |

**TRV 00084**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003



**Room: Elevation**                          **Formula Elevation 28'7" x ... x 10'1"**

| | | | |
|---|---|---|---|
| 359.67 | SF Walls | 0.00 | SF Ceiling |
| 0.00 | SF Walls & Ceiling | 0.00 | SF Floor |
| 0.00 | SY Flooring | 28.58 | LF Floor Perimeter |
| 359.67 | SF Long Wall | 359.67 | SF Short Wall |
| 30.28 | LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Metal lath & stucco | 359.67 SF | 0.00 | 4.89 | 1,758.80 |
| 2" x 8" lumber (1.33 BF per LF)- varge rafters | 40.00 EA | 0.00 | 3.55 | 142.00 |
| Seal & paint stucco | 359.67 SF | 0.00 | 0.93 | 334.50 |
| Prime & paint exterior soffit - exposed rafters | 40.00 SF | 0.00 | 2.08 | 83.20 |
| **Room Totals: Elevation** | | | | **2,318.50** |



**Room: Rear Elevation**                     **Formula Elevation 58'6" x ... x 9'3"**

| | | | |
|---|---|---|---|
| 541.13 | SF Walls | 0.00 | SF Ceiling |
| 0.00 | SF Walls & Ceiling | 0.00 | SF Floor |
| 0.00 | SY Flooring | 58.50 | LF Floor Perimeter |
| 541.13 | SF Long Wall | 541.13 | SF Short Wall |
| 58.50 | LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Metal lath & stucco | 541.13 SF | 0.00 | 4.89 | 2,646.10 |
| Gutter / downspout - aluminum | 70.50 LF | 0.00 | 4.02 | 283.41 |
| Fascia - 1" x 8" #1 pine | 58.50 LF | 0.00 | 5.35 | 312.98 |
| Aluminum window, horiz. slider 24-32 sf | 2.00 EA | 0.00 | 279.79 | 559.58 |
| Aluminum window, horiz. slider 12-23 sf | 3.00 EA | 0.00 | 206.19 | 618.57 |
| Aluminum window, horiz. slider 3-11 sf | 1.00 EA | 0.00 | 151.90 | 151.90 |
| Exterior light fixture | 1.00 EA | 0.00 | 70.09 | 70.09 |
| Seal & paint stucco | 541.13 SF | 0.00 | 0.93 | 503.25 |
| Paint door or window opening - 2 coats (per side) | 2.00 EA | 0.00 | 20.95 | 41.90 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 20.18 | 40.36 |
| Prime & paint exterior soffit - exposed rafters | 58.50 SF | 0.00 | 2.08 | 121.68 |
| Prime & paint gutter / downspout | 70.50 LF | 0.00 | 1.12 | 78.96 |
| Meter base and main disconnect - 100 - 125 amp | 1.00 EA | 0.00 | 182.03 | 182.03 |
| Meter mast for overhead power - 2" conduit | 1.00 EA | 0.00 | 362.40 | 362.40 |
| R&R Drinking fountain | 1.00 EA | 73.05 | 116.05 | 189.10 |
| Above item has been modified to detach and reset. | | | | |

2004-11-22-0959

**TRV 00085**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

## CONTINUED - Rear Elevation

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Detach and reset plumbing on the exterior wall as necessary | 1.00 EA | 0.00 | 664.77 | 664.77 |
| Includes misting and eyewash | | | | |
| Joist - floor or ceiling - 2x6 - w/blocking - 16" oc | 2,643.75 SF | 0.00 | 2.03 | 5,366.81 |
| 4" x 4" wood post - redwood (1.33 BF per LF) | 82.00 LF | 0.00 | 7.58 | 621.56 |
| Corrugated fiberglass roofing (greenhouse type) | 312.00 SF | 0.00 | 2.00 | 624.00 |
| Paint trellis and posts | 1.00 EA | 0.00 | 1,159.14 | 1,159.14 |
| **Room Totals: Rear Elevation** | | | | **14,598.59** |



## Room: General Conditions

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Carpenter - General Framer - per hour | 86.11 HR | 0.00 | 72.83 | 6,271.39 |
| Taxes, insurance, permits & fees (Bid item) | 1.00 EA | | | Open Item |
| Architectural/Drafting fees (Bid item) | 1.00 EA | | | Open Item |
| Field supervisor | 160.00 HR | 0.00 | 69.49 | 11,118.40 |
| Temporary toilet (per month) | 4.00 MO | 0.00 | 82.50 | 330.00 |
| Temporary power usage (per month) | 4.00 MO | 0.00 | 89.22 | 356.88 |
| Temporary power - hookup | 1.00 EA | 0.00 | 166.80 | 166.80 |
| Gas Line pressure test | 1.00 EA | 0.00 | 376.51 | 376.51 |
| Demo as necessary | 1.00 EA | 15,000.00 | 0.00 | 15,000.00 |
| **Room Totals: General Conditions** | | | | **33,619.98** |
| **Line Item Subtotals: 2004-11-22-0959** | | | | **140,410.95** |

2004-11-22-0959

**TRV 00086**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

| Adjustments for Base Service Charges | Adjustment |
|---|---|
| Carpenter - Finish, Trim/Cabinet | 142.82 |
| Carpenter - General Framer | 136.46 |
| Carpenter - General Framer | 145.66 |
| Carpenter - Mechanic | 138.68 |
| Carpenter - Mechanic | 138.98 |
| Drywall Installer/Finisher | 282.32 |
| Electrician | 170.28 |
| Flooring Installer | 146.24 |
| Hardware Installer | 120.64 |
| Heating / A.C. Mechanic | 148.58 |
| Insulation Installer | 119.10 |
| General Laborer | 37.52 |
| Plumber | 154.92 |
| Plumber | 162.34 |
| Painter | 111.52 |
| Roofer | 226.68 |
| Siding Installer | 138.88 |
| Stucco Installer | 219.68 |
| Tile/Cultured Marble Installer | 157.62 |
| Total Adjustments for Base Service Charges: | 2,898.92 |
| **Line Item Totals: 2004-11-22-0959** | **143,309.87** |

**Grand Total Areas:**

| | | |
|---|---|---|
| 5,057.23 SF Walls | 1,595.78 SF Ceiling | 6,653.01 SF Walls & Ceiling |
| 1,595.78 SF Floor | 177.31 SY Flooring | 597.84 LF Floor Perimeter |
| 1,903.28 SF Long Wall | 1,903.28 SF Short Wall | 655.14 LF Ceil. Perimeter |
| | | |
| 1,595.78 Floor Area | 1,645.38 Total Area | 3,153.95 Interior Wall Area |
| 1,506.67 Exterior Wall Area | 188.33 Exterior Perimeter of Walls | |
| | | |
| 1,874.23 Surface Area | 18.74 Number of Squares | 187.31 Total Perimeter Length |
| 71.58 Total Ridge Length | 0.00 Total Hip Length | 981.40 Area of Face 1 |
| 892.83 Area of Face 2 | | |

2004-11-22-0959

**TRV 00087**



**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

## Summary for Fire

| | | | | |
|---|---|---|---|---|
| Line Item Total | | | | 140,410.95 |
| Total Adjustments for Base Service Charges | | | | 2,898.92 |
| Material Sales Tax | @ | 8.250% | 47,916.60 | 3,953.12 |
| Subtotal | | | | 147,262.99 |
| Overhead | @ | 10.00% | 147,262.99 | 14,726.30 |
| Profit | @ | 10.00% | 147,262.99 | 14,726.30 |
| **Grand Total** | | | | **176,715.59** |

Murat Zilinki

2004-11-22-0959

TRV 00088

**Walter M. Springs Construction**

881 Hurlingame Ave.
Redwood City, CA 94063-3519
650-298-9300 Fax 650-306-9388
CA Lic. 232003

## Recap By Category

| O&P Items | | | Total Dollars | % |
|---|---|---|---:|---:|
| APPLIANCES | | | 2,171.46 | 1.23% |
| CABINETRY | | | 14,124.30 | 7.99% |
| GENERAL DEMOLITION | | | 15,278.03 | 8.65% |
| DOORS | | | 3,712.70 | 2.10% |
| DRYWALL | | | 7,902.37 | 4.47% |
| ELECTRICAL | | | 7,973.92 | 4.51% |
| FLOOR COVERING - CARPET | | | 1,987.18 | 1.12% |
| FLOOR COVERING - VINYL | | | 5,216.18 | 2.95% |
| FINISH CARPENTRY / TRIMWORK | | | 1,487.60 | 0.84% |
| FINISH HARDWARE | | | 655.59 | 0.37% |
| FRAMING & ROUGH CARPENTRY | | | 35,953.91 | 20.35% |
| HEAT,  VENT & AIR CONDITIONING | | | 4,235.90 | 2.40% |
| INSULATION | | | 1,171.48 | 0.66% |
| LIGHT FIXTURES | | | 1,003.07 | 0.57% |
| MARBLE - CULTURED OR NATURAL | | | 249.39 | 0.14% |
| PLUMBING | | | 5,522.71 | 3.13% |
| PANELING & WOOD WALL FINISHES | | | 457.22 | 0.26% |
| PAINTING | | | 8,340.72 | 4.72% |
| ROOFING | | | 7,995.35 | 4.52% |
| SIDING | | | 992.88 | 0.56% |
| SOFFIT, FASCIA, & GUTTER | | | 987.72 | 0.56% |
| SPECIALTY ITEMS | | | 72.51 | 0.04% |
| STUCCO & EXTERIOR PLASTER | | | 9,307.03 | 5.27% |
| TEMPORARY REPAIRS | | | 853.68 | 0.48% |
| WINDOWS - ALUMINUM | | | 1,330.05 | 0.75% |
| WINDOWS - VINYL | | | 1,428.00 | 0.81% |
| **Subtotal** | | | **140,410.95** | **79.46%** |
| Base Service Charges | | | 2,898.92 | 1.64% |
| Material Sales Tax | @ | 8.250% | 3,953.12 | 2.24% |
| Overhead | @ | 10.00% | 14,726.30 | 8.33% |
| Profit | @ | 10.00% | 14,726.30 | 8.33% |
| **O&P Items Subtotal** | | | **176,715.59** | **100.00%** |
| **Grand Total** | | | **176,715.59** | |

2004-11-22-0959

12/27/2004  Page:  1

TRV 00089

# EXHIBIT C

# EXHIBIT C



## U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | GP 3130844002 SF |
| SBA Loan Name | LOVE AND CARE PRESCHOOL |
| Date | *October 7, 1999* |
| Loan Amount | $218,000.00 |
| Interest Rate | PRIME PLUS (2.75%) PERCENTAGE |
| Borrower | LAVELDA SINGLETON |
| Operating Company | |
| Lender | WESTMINSTER DEVELOPMENT BANK |

1. **PROMISE TO PAY:**

   In return for the Loan, Borrower promises to pay to the order of Lender the amount of

   _____ TWO HUNDRED EIGHTEEN THOUSAND ($218,000.00) & 00/100 _____ Dollars,

   interest on the unpaid principal balance, and all other amounts required by this Note.

2. **DEFINITIONS:**

   "Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

   "Guarantor" means each person or entity that signs a guarantee of payment of this Note.

   "Loan" means the loan evidenced by this Note.

   "Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

   "SBA" means the Small Business Administration, an Agency of the United States of America.

EXHIBIT A

4.   RIGHT TO PREPAY:

Borrower may prepay this Note.  Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice.  If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

A.   Give Lender written notice;

B.   Pay all accrued interest; and

C.   If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph B.

If Borrower does not prepay within 60 days from the date Lender receives the notice, Borrower must give Lender a new notice.

5.   DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.   Fails to do anything required by this Note and other Loan Documents;

B.   Defaults on any other loan with Lender;

C.   Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.   Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E.   Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F.   Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.   Fails to pay any taxes when due;

H.   Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.   Has a receiver or liquidator appointed for any part of their business or property;

J.   Makes an assignment for the benefit of creditors;

K.   Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.   Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent;  or

M.   Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay  this Note.

6.   LENDER'S RIGHTS IF THERE  IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.   Require immediate payment of all amounts owing under this Note;

B.   Collect all amounts owing from any Borrower or Guarantor;

C.   File suit and obtain judgment;

D.   Take possession of any Collateral; or

E.   Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

7.  LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.  Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C.  Release anyone obligated to pay this Note;

D.  Compromise, release, renew, extend or substitute any of the Collateral; and

E.  Take any action necessary to protect the Collateral or collect amounts owing on this Note.


8.  WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.


9.  SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.


10.  GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses.

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.  If any part of this Note is unenforceable, all other parts remain in effect.

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

11. STATE-SPECIFIC PROVISIONS:

Borrower acknowledges this Note is secured by a Deed of Trust in favor of Lender on real property located in Alameda County, State of California. That Deed of Trust contains the following due-on-sale provision:

5.1 Events of Default. The term "Event(s) of Default", as used in the Security Documents and in the Note, shall mean the occurrence or happening, from time to time, of any one or more of the following:

...

5.1.9 Due on Sale. If, without the prior written consent of Beneficiary, there is (i) any lease with a term of one year or longer, sale, transfer, assignment, agreement for deed, conveyance, hypothecation or encumbrance whether voluntary or involuntary, of all or part of the Mortgaged Property or any interest therein, or (ii) any sale, assignment, pledge, encumbrance or transfer to a third party of an aggregate of more than 20% of the corporate voting stock of Grantor or an aggregate of more than 20% of the partnership interests of Grantor if such entity is a partnership, or an aggregate of more than 20% of the ownership interests of Grantor, if such entity is a limited liability company or other form of ownership organization, or (iii) the seizure of the Mortgaged Property, Personalty or Fixtures or attachment of any lien on the Mortgaged Property, whether voluntary or involuntary, which has not been removed or bonded off to Beneficiary's satisfaction within sixty (60) days of such attachment.

...

6.1. Remedies. If an Event of Default shall occur, Beneficiary may, at its option, by or through Trustee or otherwise, exercise one or more or all of the following remedies:

6.1.1. Acceleration. Declare the unpaid portion of the Indebtedness to be immediately due and payable, without further notice or demand (each of which hereby is expressly waived by Grantor), whereupon the same shall become immediately due and payable.

...

SBA Form 147 (10/22/98) Previous editions obsolete

12. **BORROWER'S NAME(S) AND SIGNATURE(S):**

By signing below, each individual or entity becomes obligated under this Note as Borrower.

WITNESS                           LAVELDA SINGLETON d/b/a
                                  LOVE AND CARE PRESCHOOL

*Paul Davis Hall*                 By *Lavelda Singleton*
                                  LAVELDA SINGLETON


### ACKNOWLEDGMENT

State of California        )
                           ) ss
County of *San Francisco*  )

On *October 7*_____, 1999 , before me, *Paula Davis-Hall, Notary Public*
[name, title of officer], personally appeared LAVELDA SINGLETON, [____] personally known to me -- OR -- [____]
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.


*Paul Davis-Hall*
Signature



The Guaranteed portion of this Note
has been transferred to a Registered
Holder for value.
Textron Business Credit, Inc.
~~Westminster Development Bank~~

_____

Dated *9/20/00*

# WESTMINSTER DEVELOPMENT BANK

## LOAN AND SECURITY AGREEMENT

| DEBTOR: LAVELDA SINGLETON d/b/a | SECURED PARTY: |
|---|---|
| LOVE AND CARE PRESCHOOL | |
| | WESTMINSTER DEVELOPMENT BANK |
| SBA Loan # GP 3130844002 SF | |
| Address: 8010 HOLANDA LANE | Address: |
| DUBLIN, CA 94568 | |
| | 40 Westminster Street |
| | Providence, Rhode Island 02903 |

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is made _October 7_, 1997, between the above named ("Debtor") and Westminster Development Bank ("Secured Party") as identified in the Authorization issued by the U.S. Small Business Administration ("SBA") to Secured Party, dated August 19, 1999("Authorization")

SBA has authorized a guaranty of a loan from Secured Party to Borrower for the amount and under the terms stated in the said Authorization (the "Loan").

In consideration of the promises in this Agreement, and for other good and valuable consideration, Debtor and Secured Party agree that, subject to the terms and conditions of the Authorization and SBA's Participating Lenders rules as defined in the Guarantee Agreement between Secured Party and SBA, Secured Party agrees to make the Loan if the Debtor:

    a.    Provides Secured Party with all certifications, documents or other information Secured Party is required by the Authorization to obtain from Debtor or any third party;

    b.    Executes a note and any other documents required by Secured Party ; and

    c.    Does everything necessary for Secured Party to comply with the terms and conditions of the Authorization.

For value received, the receipt and sufficiency of which is hereby acknowledged, Debtor hereby grants to Secured Party, a Rhode Island loan and investment bank with its principal place of business in Providence, Rhode Island, the security interests set forth below on the terms and conditions set forth herein.

For purposes of this Agreement, any party which controls, is controlled by or under common control with another party shall be deemed an "affiliate" of such other party. The term "control" means the possession, directly or indirectly, of the power to cause the direction of the management and policies of a party, whether through the ownership of voting securities, by contract or otherwise.

### 1.  DEFINITIONS

When used herein, the terms set forth below shall be defined as follows:

    1.1    "Date of Agreement" is: _October 7_, 1999.

    1.2    "Equipment" means all machinery and equipment and furniture and fixtures of Debtor (xxxxxxx/excluding – strike one – automotive equipment), now owned or hereafter acquired by Debtor, and used or acquired for use in the business of Debtor, together with all accessions thereto and all substitutions and replacements thereof and parts therefor, all cash or non-cash proceeds and including, without limitation, all Equipment listed on any schedule attached hereto.

    1.3    "Inventory" means all goods, merchandise and other personal property now owned or hereafter acquired by Debtor which are held for sale or lease, or are furnished or to be furnished under any contract of service or are raw materials, work-in-process, supplies or materials used or consumed in Debtor's business, and all products thereof, and all substitutions, replacements, additions or accessions therefore and thereto; all cash or non-cash proceeds of all of the foregoing, including insurance proceeds, and including , without limitation, all inventory listed on any schedule attached hereto.

    1.4    "Receivables" means all accounts, contract rights , instruments, documents, chattel paper, general intangibles (including, without limitation, chooses in action, tax refunds, and insurance proceeds); any other obligations or indebtedness owed to Debtor form whatever source arising; all rights of Debtor to receive any payments in money or kind; all guarantees of Receivables and security therefor; all cash or non-cash proceeds of all of the foregoing; all of the right, title and interest of Debtor in and with respect to the goods, services or other property which gave rise to or which secure any of the Receivables and insurance policies and proceeds relating thereto, and all of the rights of Debtor as an unpaid seller of goods or services, including, without limitation, the rights of stoppage in transit, replevin, reclamation and resale; and all of the foregoing, whether now existing or hereafter created or acquired.

    1.5    "Collateral" means:

        1.5.1    Receivables; Inventory and Equipment

        1.5.2    All ledger sheets, files, records, documents and instruments (including, without limitation, computer programs, tapes and related electronic data processing software) evidencing an interest in or relating to the Collateral; and

        1.5.3    All instruments, documents, securities cash, property and the proceeds of any of the foregoing, owned by Debtor or in which Debtor has an interest, which now or hereafter are at any time in possession or control of Secured Party or in transit by mail or carrier to or from Secured Party or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same.

    1.6    "Event of Default" means each and every event specified in Section 5 of this Agreement.

    1.7    "Obligations" means all indebtedness, obligations and liabilities of Debtor to Secured Party of every kind and description, direct or indirect, secured or unsecured, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising, regardless of how the same arise or by what instrument, agreement or book account they may be evidenced, or whether evidenced by any instrument, agreement or book account including, without limitation, all loans (including any loan by renewal or extension), all indebtedness, all undertakings to take or refrain from taking any action, all indebtedness, liabilities or obligations owing from Debtor to others which Secured Party may have obtained by purchase, negotiation, discount, assignment or otherwise, and all interest, taxes, fees, charges, expenses and attorney's fees chargeable to borrower or incurred by Secured Party under this Agreement, or any other document or instrument delivered in connection herewith, and further including, without limitation, all obligations of Debtor to Secured Party pursuant to:  SBA Promissory Note in the principal amount of S218,000.00 of execution date hereof and Authorization (SBA Guaranteed Loan) among SBA and Secured Party ("SBA Agreement").

Notwithstanding the foregoing, Secured Party waives any rights to Collateral or any other property of Debtor with Secured Party as security for any indebtedness of an individual Debtor to Secured Party to which the Truth-in-Lending Act and Regulation Z promulgated thereunder apply.

To the extent not defined in this Section 1, unless the context otherwise requires, all other terms contained in this Agreement shall have the meanings attributed to them by Article 9 of the Uniform Commercial Code in force in the State of Rhode Island, as of the Date of Agreement, to the extent the same are used or defined therein.

### 2.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.

Debtor represents and warrants and such representations and warranties shall be continuing representations and warranties as long as any Obligations shall remain outstanding, as follows:

## EXHIBIT B

 

2.1. **Ownership; No Encumbrances.** Except for the security interests granted Secured Party, the Debtor is and will be the owner of all Collateral free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature.

2.2. **Organization.** If a corporation, Debtor has been duly incorporated and organized and is existing as a corporation in good standing under the laws of its jurisdiction or incorporation and is duly qualified and in good standing as a foreign corporation in those jurisdictions where the conduct of its business or the ownership of its properties requires qualification.

2.3. **Tradename/Location.** Debtor utilizes no trade names, in the conduct of its business, except as set forth in Section 9 of this Agreement: has not changed its name, been the surviving entity in a merger acquired any business; or (if Receivables are included as Collateral), changed the location of its chief place of business or chief executive office or the location of its records with respect to Receivables or the location of any returns of Inventory; or (if Inventory is included as Collateral), the location of any of the Inventory; or (if Equipment is included as Collateral), the location of the Equipment, except as set forth in Section 9 hereof.

2.4. **No Default.** Debtor is not in default with respect to any agreement to which it is a party or by which it is bound. The execution and performance of this Agreement and any other document or instrument to be delivered hereunder or as a supplement hereto will not violate any law or the terms of the incorporation documents or bylaws of Debtor nor will it violate or result in a default or in the creation or imposition of any lien or encumbrance upon any of the Collateral (immediately, with the passage of time, or with the giving of notice and the passage of time) under any other contract, agreement or instrument to which Debtor is bound; nor will it result in the acceleration of any obligation under any mortgage, lien, lease, franchise, license, permit, agreement, instrument, order, arbitration award, judgment or decree, or in the termination of any license, franchise, lease or permit, to which Debtor is a party, or by which it is bound; and it will not violate or conflict with any other restriction of any kind or character to which Debtor is subject.

2.5. **Authority.** This Agreement and any document or instrument delivered in connection herewith and the transactions contemplated hereby or thereby have been duly authorized and/or executed and delivered, as appropriate; and this Agreement and such other documents and instruments constitute valid and legally binding obligations of Debtor and are enforceable against Debtor in accordance with their respective terms. Debtor has the power and authority to own the Collateral, to enter into and perform this Agreement, and any other document or instrument delivered in connection herewith and to incur the Obligations.

2.6. **No Financing Statements.** During the term of this Agreement, there will be no financing statement or similar filing on file in any public office covering any part of the Collateral, and Debtor will not execute one, except the financing statements filed or to be filed in favor of Secured Party or those filed by third parties who have properly subordinated their interests in favor of Secured Party or as set forth in Section 9 of this Agreement.

2.7. **Accuracy of Information.** All information furnished to Secured Party concerning Debtor, the Collateral and the Obligations, or otherwise for the purpose of obtaining or maintaining credit, is or will be at the time the same is furnished, accurate and complete in all material respects.

2.8. **Addresses.** The address of Debtor designated at the beginning of this Agreement is Debtor's Chief Executive Office. Debtor agrees not to change such address without advance written notice to Secured Party.

3. **GRANT OF SECURITY INTEREST**

To secure the payment and performance of the Obligations, Debtor hereby pledges, assigns, and transfers to Secured Party, and grants to Secured Party a continuing security interest in and to all of the Collateral.

4. **GENERAL COVENANTS.** Debtor covenants and agrees as follows:

4.1. **Operation of the Collateral.** Debtor agrees to use the Collateral solely in the conduct of its own business, in a careful and proper manner, and in conformity with all applicable permits or licenses. Debtor shall comply in all respects with all applicable statutes, laws, ordinances, and regulations. Debtor shall not use the Collateral in any unlawful manner or for any unlawful purposes, or in any manner or for any purpose that would expose the Collateral to unusual risk, or to penalty forfeiture or capture, or that would render inoperative any insurance covering or issued in connection with the Collateral.

4.2. **Condition.** Debtor shall maintain, service and repair the Collateral, if Equipment and/or Inventory, so as to keep it in good operating condition. Debtor shall replace within a reasonable time all parts that may be worn out, lost, destroyed or otherwise rendered unfit for use, with appropriate replacement parts. Debtor shall obtain and maintain in good standing at all times all applicable permits, licenses, registrations and certificates respecting the Collateral. Debtor shall not affix any of the Collateral to any real property without the prior written consent of Secured Party. Debtor agrees that the Collateral is and shall at all times remain personal property notwithstanding that it may now or hereafter be affixed to realty.

All books, records, and documents relating to any of the Receivables (including computer records) are and will be genuine and in all respects what they purport to be; and the amount of each Receivable shown on the books and records of Debtor is and will be the correct amount actually owing or to be owing at maturity of such Receivables.

Until Secured Party directs otherwise, upon an Event of Default, Debtor shall collect the Receivables, subject to the direction and control of Secured Party at all times. Any proceeds of Receivables collected by Debtor shall not be commingled with other funds of Debtor and shall, upon the request of Secured Party, be immediately delivered to Secured Party in the form received, except for necessary endorsement to permit collection; Secured Party may, in its sole discretion, allow Debtor to use such funds to such extent and for such periods, if any, as Secured Party elects.

4.3. **Assessments.** Debtor shall promptly pay when due all taxes, assessments, licenses, fees, registration fees, and governmental charges levied or assessed against Debtor or with respect to the Collateral or any part thereof.

4.4. **Location.** Except as otherwise provided in this Agreement, Debtor shall not remove the Collateral from Debtor's Address Listed, above, without Secured Party's prior written consent; except that if the Collateral is of a type that is normally moved from site to site or constitutes Mobile Goods, as such term is defined in the Uniform Commercial Code, it may temporarily be removed from such location provided that it will be based at such location and stored there when not in use.

4.5. **No Transfer.** Debtor shall not, without the prior written consent of Secured Party, sell, assign, transfer, lease, charter, encumber, hypothecate or dispose of the Collateral, or any part thereof, or interest therein, or offer to do any of the foregoing.

4.6. **Notices and Reports.** Debtor shall promptly notify Secured Party in writing of any change in the name, identity or the structure of Debtor, any charge lien, security interest, claim or encumbrance asserted against the Collateral, any litigation involving the Collateral, any theft, loss, injury or similar incident involving the Collateral, and any other material matter adversely affecting Debtor or the Collateral. Debtor shall furnish such other reports, information and data regarding Debtor's financial condition and operations, the Collateral and such other matters as Secured Party may request from time to time. If requested by either the SBA Agreement or Secured Party, Debtor will, within 90 days of the close of each of its fiscal years, deliver to Secured Party Debtor's balance sheet and statement of income certified to by a recognized firm of certified public accountants or by Debtor's Chief Financial Officer, as being prepared in accordance with generally accepted accounting principles consistently applied, and Debtor, upon request, will deliver to Secured Party, within 90 days of the close of each fiscal quarter, copies of Debtor's quarterly balance sheet and statement of income for the quarter just ended, certified by Debtor's Chief Financial Officer.

4.7. **Landlord's Waivers.** Debtor shall furnish to Secured Party, if requested, a landlord's and/or mortgagee's waiver of all liens with respect to any Collateral covered by this Agreement that is or may be located upon leased or mortgaged premises, such waivers to include permission to remove the Collateral from the premises and to be in such form and upon such terms as are acceptable to Secured Party.

4.8. **Additional Assurance.** Debtor shall do, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as Secured Party may require in order to vest in and assure the Secured Party its rights hereunder or in any of the Collateral, including without limitation, execution and delivery of financing statements which Secured Party deems appropriate to perfect and continue the security interests hereby granted. Debtor hereby irrevocably appoints Secured Party and each of its employees as its true and lawful attorney with full power and authority for Debtor and in the Debtor's name to sign and file financing statements covering the Collateral and any and all documents necessary to protect and record Secured Party's interest in the Collateral under any applicable Certificate of Title statute. Secured Party may file or record this Agreement, or a photographic copy hereof, as a financing statement.

4.9. **Protection of Collateral.** Secured Party, at its option and without prior notice to Debtor, after an Event of Default, but without any obligation whatsoever to do so, may: (a) discharge taxes, claims, charges, liens, security interests, assessments or other encumbrances of any and every nature whatsoever at any time levied, placed upon or asserted against the Collateral; (b) obtain and pay for insurance on the Collateral, including insurance that only protects Secured Party's interest; (c) pay for the repair, improvement, testing, maintenance and preservation of the Collateral; (d) pay any filing, recording, registration, licensing or certification fees or other fees and charges related to the Collateral; or (e) take any other action to preserve and protect the Collateral and Secured Party's rights and remedies under this Agreement as Secured Party may deem necessary or appropriate.

 

Debtor further agrees to reimburse Secured Party promptly upon demand for any payment made or any expense incurred by the Secured Party pursuant to this authorization. These payments and expenditures, together with interest thereon from the date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement.

4.10.    Inspection. Debtor shall at all reasonable times allow Secured Party, by or through any of its officers, agents, attorneys or accountants, to examine the Collateral, wherever located, and to examine and make extracts from Debtor's books and records.

4.11.    Insurance. Debtor shall have and maintain insurance at all times with respect to all tangible Collateral insuring against risks of fire, theft and other risks (so-called "All Risk") as Secured Party may require, containing such terms, in such form and amounts and written by such companies as may be satisfactory to Secured Party, all of such insurance to contain a loss payable clause in favor of Secured Party, as their interests may appear. All policies of insurance shall provide for 30 days' written minimum cancellation notice to Secured Party and, at the request of Secured Party, shall be delivered to and held by it. Such insurance shall be primary to Secured Party and non-contributory with any other insurance carried by Secured Party. The insurance shall not be invalidated as against Secured Party for any violation of any term of the policy or Debtor's application therefor. Upon an Event of Default, Secured Party is hereby authorized to act as attorney for Debtor in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts or instruments. Secured Party shall be authorized to apply the proceeds from any insurance to the Obligations secured hereby whether or not such Obligations are then due and payable.

## 5.    EVENTS OF DEFAULT.

The occurrence of any of the following shall, at the option of Secured Party and without any notice other than as provided herein, constitute an Event of Default under this Agreement:

5.1.    Debtor fails to pay any sums due under any of the Obligations as and when due;

5.2.    Debtor fails to perform any other covenant related to the Obligations or contained herein and such failure continues for twenty (20) days after written notice by Secured Party to Debtor, or Debtor failure to abide by any of Debtor's Obligations or terms of the Authorization that pertain to the Debtor;

5.3.    Debtor shall be in default in the payment of any other obligation now or hereafter owed by Debtor to Secured Party under any other agreement or instrument;

5.4.    Debtor files a petition in bankruptcy, or for reorganization, or for an arrangement pursuant to the U.S. Bankruptcy Code, or any similar federal or state or foreign law, or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts generally as they become due, or is dissolved, or suspends payment of any of its obligations, or takes any action in furtherance of any of the foregoing;

5.5.    A petition or answer proposing the adjudication of Debtor as a bankrupt, or its reorganization under the U.S. Bankruptcy Code, or any similar federal or state or foreign law is filed in any court and (i) Debtor shall consent to such filing, or (ii) such petition or answer is not discharged or denied within sixty (60) days after such filing;

5.6.    A receiver, trustee or liquidator (or other similar official) is appointed for or takes possession or charge of Debtor, substantially all of its assets, or any Collateral;

5.7.    Debtor's interest in any Collateral is levied upon or attached in any proceeding, and such process is not vacated or discharged within thirty (30) days thereafter;

5.8.    Debtor attempts to sell, transfer, mortgage, pledge, or otherwise encumber, sublet or part with possession of any Collateral without Secured Party's prior written consent;

## 6.    REMEDIES.

Upon the occurrence of an Event of Default, Secured Party, at its option, shall be entitled to exercise any one or more of the following remedies (all of which are cumulative):

6.1.    Declare Obligations Due. Secured Party, at its option, may declare the Obligations or any part thereof immediately due and payable, without demand, notice of intention to accelerate, notice of acceleration, notice of nonpayment, presentment, protest, notice of dishonor, or any other notice whatsoever, all of which are hereby waived by Debtor and any maker, endorser, guarantor, surety or other party liable in any capacity for any of the Obligations.

6.2.    Other Remedies. Secured Party shall have all of the rights and remedies provided for in this Agreement and in any other agreements executed by Debtor, the rights and remedies in the Uniform Commercial Code and any and all of the rights and remedies at law and equity, all of which shall be deemed cumulative. Without limiting the foregoing, Debtor agrees that Secured Party shall have the right to: (a) require Debtor to assemble the Collateral and make it available to Secured Party at a place designated by Secured Party; (b) take possession of the Collateral, with or without process of law, and in this connection, enter any premises where the Collateral is located to remove same, to render it unusable, or to dispose of same on such premises; (c) sell, lease or otherwise dispose of the Collateral, by public or private proceedings, for cash or credit, without assumption of credit risk; and/or (d) whether before or after default, collect and receipt for, compound, compromise, and settle, and give releases, discharges and acquittances with respect to any and all amounts owed by any person or entity with respect to the Collateral. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will send Debtor reasonable notice of the time and place of any public sale or of the time after which any private sale or other disposition will be made. Any requirement of reasonable notice to Debtor shall be met if such notice is mailed, postage prepaid, to Debtor at the address of Debtor designated at the beginning of this Agreement, at least 10 days before the day of any public sale or at least 10 days before the time after which any private sale or other disposition will be made.

6.3.    Expenses. Debtor shall be liable for and agrees to pay the reasonable expenses incurred by Secured Party in enforcing its rights and remedies, in retaking, holding, testing, repairing, improving, selling, leasing or disposing of the Collateral, or like expenses, including, without limitation, attorneys' fees and legal expenses incurred by Secured Party. These expenses, together with interest thereon from the date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement. All reasonable efforts will be made to avoid duplicate costs and expenses.

6.4.    Proceeds; Surplus; Deficiencies. Proceeds received by Secured Party from disposition of the Collateral shall be applied toward Secured Party's expenses and other Obligations in the order or manner provided herein. Debtor shall be entitled to any surplus if one results after lawful application of all proceeds. Debtor shall remain liable for any deficiency.

6.5.    Remedies Cumulative. In addition to the remedies set forth in the SBA Agreement or any other document evidencing the Obligations, the rights and remedies of Secured Party are cumulative and the exercise of any one or more of the rights or remedies shall not be deemed an election of rights or remedies or a waiver of any other right or remedy. Secured Party may remedy any default without waiving the default remedied and may waive any default without waiving any other prior or subsequent default.

## 7.    OTHER AGREEMENTS.

7.1.    Savings Clause. Notwithstanding any provision to the contrary herein, or in any of the documents evidencing the Obligations or otherwise relating thereto, no such provision shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable usury laws. If any such excessive interest is so provided for, then in such event: (a) the provisions of this paragraph shall govern and control; (b) neither the Debtor nor his heirs, legal representatives, successors or assigns or any other party liable for the payment thereof shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount permitted by law; (c) any such excess interest that may have been collected shall be, at the option of the holder of the instrument evidencing the Obligations, either applied as a credit against the unpaid principal amount thereof or refunded to the maker thereof; and (d) the effective rate of interest shall be automatically reduced to the maximum lawful rate under applicable usury laws as now or hereafter construed by the courts having jurisdiction.

7.2.    Joint and Several Responsibility. If this Security Agreement is executed by more than one Debtor, the obligations of all such Debtors shall be joint and several.

7.3.    Waivers. Debtor and any maker, endorser, guarantor, surety or other party liable in any capacity respecting the Obligations hereby waive demand, notice of intention to accelerate, notice of acceleration, notice of nonpayment, presentment, protest, notice of dishonor and to the extent permitted by law, any other similar notices whatsoever.

7.4.    Severability. Any provision hereof found to be invalid by the courts having jurisdiction shall be invalid only with respect to such provision (and then only to the extent necessary to avoid such invalidity). The offending provision shall be modified to the maximum extent possible to confer upon Secured Party the

3




benefits intended thereby. Such provision as modified and the remaining provisions hereof shall be construed and enforced to the same effect as if such offending provision or portion thereof had not been contained herein, to the maximum extent possible.

7.5. Notices. Any notice or demand given by Secured Party to Debtor in connection with this Agreement, the Collateral or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, addressed to Debtor at the address of Debtor designated at the beginning of this Agreement. Actual notice to Debtor shall always be effective no matter how given or received.

7.6. Amendments. Neither this Agreement nor any of its provisions may be changed, amended, modified, waived or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of the change, amendment, modification, waiver or discharge is sought.

7.7. Binding Effect. The provisions of this Agreement shall be binding upon the heirs, personal representatives, successors and assigns of Debtor and the rights, powers and remedies of Secured Party hereunder shall inure to the benefit of the successors and assigns of Secured Party.

7.8 Secured Party Not a Fiduciary. The relationship between Debtor and Secured Party is solely of debtor and creditor, and Secured Party has no fiduciary or other special relationship with Debtor, and no term or provision of any of the Loan documents evidencing the Obligations shall be construed so as to deem the relationship between the parties to be other than that of debtor and creditor.

7.9. Governing Law. This Security Agreement shall be governed by the substantive law of the State of Rhode Island and applicable Federal law. Debtor consents to the non-exclusive jurisdiction of any court of general jurisdiction sitting in Providence County, Rhode Island in any and all actions and proceedings between the parties hereto arising under or growing out of this Security Agreement or any of the Obligations, and irrevocably agrees to service of process by any means authorized under Rhode Island law.

8. ASSIGNMENT BY BANK

Secured Party may, from time to time, without notice to the undersigned, sell, assign, transfer or otherwise dispose of all or any part of the Obligations and/or the Collateral therefor. In such event, each and every immediate and successive purchaser, assignee, transferee or holder of all or any part of the Obligations and/or the Collateral shall have the right to enforce this Agreement, by legal action or otherwise, for its own benefit as fully as if such purchaser, assignee, transferee or holder were herein by name specifically given such rights; Secured Party shall have an unimpaired right to enforce this Agreement for its benefit to that portion of the Obligations of Debtor as Secured Party has not sold, assigned, transferred or otherwise disposed of.

9. ADDITIONAL INFORMATION

Information, if any, required to be set forth herein by paragraphs as applicable shall be inserted in the following spaces:

2.3    (Borrower's trade names, prior names, predecessors of mergers, businesses acquired and/or other locations.)

2.3    (Location of Inventory or records with respect thereto other than Debtor's Address; Address of other places(s) of business of Borrower where records (including computer records) with respect to Receivables or returns of Inventory are kept other than Borrower's Address.)

2.6    (other financing statements)

10. SBA ENFORCEMENT

*The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:*

*a)    When SBA is the holder of the Note, this documents and all documents evidencing or securing this Loan will be construed in accordance with federal law.*

*b)    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.*

*Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.*

11. ADDITIONAL PROVISIONS APPLICABLE TO DEBTOR (IF ANY)

This Agreement shall secure any moneys due or to become due under Policy(ies) No. _006 372 305_ and under any contracts, supplemental or additional thereto issued by _Farmers New World Life_ on the life of LAVELDA SINGLETON, including, without limitation, any and all accrued or future dividends, refunds for premiums paid in advance, double indemnity, distributions of shares of surplus or additions to the Policy(ies) now or hereafter made or apportioned thereto, together with any and all claims, options, privileges, rights, title and interest in and under the Policy(ies) subject, however, to all the terms and conditions of the Policy(ies).

EXECUTED as of the date shown above.

Attest/Witness:

_____

LAVELDA SINGLETON d/b/a
LOVE AND CARE PRESCHOOL

By: _Lavelda Singleton_

Print Name: LAVELDA SINGLETON

Print Title:

[Corporate Seal]

WESTMINSTER DEVELOPMENT BANK

By: _____

Print Name: Jennifer L Walls

Print Title: Asst Vice Pres

_____

# EXHIBIT D

# EXHIBIT D



**Allyson Delgado**
General Adjuster
Commercial Property—MCU
P.O. Box 55475
Valencia, CA 91385
(661) 260-3352
(661) 290-2960 (fax)

February 16, 2005

La Velda Singleton
Love & Care Preschool
8010 Holanda Lane
Dublin, CA 94568

Re:    Insured:                                 Love & Care Preschool
       Claim Number:                            ACH3121
       Date of Loss (Reported As):              11/17/2004
       Underwriting Company:                    Travelers Indemnity Company of Connecticut

Dear Ms. Singleton:

We are writing to advise you of the status of your claim for property located at 8010 Holanda Lane, Dublin, CA. We take this opportunity to share our findings with you.

A check in the amount of $104,852.49 is being forwarded to you under separate cover. This payment is outlined on the enclosed statement of loss. You should receive this check within five to seven business days. The repairs to your building total $176,715.59 plus $4,672.44 for emergency service. Please be advised that this repair cost does not include any code related upgrade items. The repair costs were determined using the agreed upon estimate with Walter Springs Construction and an invoice received from Vanderbilt Construction, a copy of the estimate is enclosed for your review along with a copy of the engineer's report. Your policy requires the settlement of claims at Actual Cash Value (Replacement Cost less depreciation) until the work has been completed and the ACV amount plus the deductible have been incurred. The ACV amount is $155,352.49; the replacement cost amount that is recoverable, if incurred, is up to $26,035.54. The check that has been sent to you represents the ACV amount less your $500 deductible less the $50,000 advance previously sent to you for the building portion of your repairs. Please advise us as soon as possible once you have hired a contractor to start repairs, so that we can work with them on the code related upgrades that may be required and any discrepancies they may have with the agreed upon repair figure.

Please be advised that we are still waiting for you to provide us with a list of personal property/contents that you are claiming along with amounts being claimed and any documentation you have for the items being claimed. As of the date of this letter, we have not received any of this requested information.

TRV 00209

Love & Care
2/16/2005
Page 2

If you have any further questions about your claim, please do not hesitate to contact me at (661) 260-3352. Please be advised that I will be on vacation starting 12/29/04 and will return on 1/10/05.

Thank you.

Sincerely,

Allyson Delgado
General Adjuster

# EXHIBIT E

# EXHIBIT E

 **ST PAUL TRAVELERS**

**Allyson Delgado**
*General Adjuster*
*Commercial Property—MCU*
*P.O. Box 55475*
*Valencia, CA 91385*
*(661) 260-3352*
*(661) 290-2960 (fax)*

April 19, 2005

La Velda Singleton
Love & Care Preschool
8010 Holanda Lane
Dublin, CA 94568



Re:     Insured:                              Love & Care Preschool
        Claim Number:                    ACH3121
        Date of Loss (Reported As):  11/17/2004
        Underwriting Company:        Travelers Indemnity Company of Connecticut

Dear Ms. Singleton:

We are writing to advise you of the status of your claim for property located at 8010 Holanda Lane, Dublin, CA. We take this opportunity to share our findings with you.

Please be advised that we are still waiting for you to provide us with a list of personal property/contents that you are claiming along with amounts being claimed and any documentation you have for the items being claimed. As of the date of this letter, we have not received any of this requested information. In view of the fact that you have not yet provided this documentation, we take this opportunity to remind you that your policy obligates you to do so. If this documentation is not available or if you require additional time to provide it to us, please let us know.

If you have any questions about your claim, please do not hesitate to contact me at (661) 260-3352.

Thank you.

Sincerely,

Allyson Delgado
General Adjuster

# EXHIBIT F

# EXHIBIT F



**Allyson Delgado**
*General Adjuster*
*Major Case Unit*
*Commercial Lines Property*
P.O. Box 55475
Valencia, CA 91385-0475
(661) 260-3352
(661) 290-2960 (fax)

**Fax Cover Sheet**

**Date:**     September 2, 2005

**To:**     **Mike Snow**          **Phone:**
                                    **Fax:**     **(925) 426-7787**

**From:**     Allyson Delgado       **Phone:**     (661) 260-3352
                                    **Fax:**     (661) 290-2960
**RE:**     Love & Care Preschool
**CC:**

**Number of pages including cover sheet:** 4

Mike,

I am sorry for the delay getting this information to you...things have just spun out of control this week.

Please review the attached clarification letter from the structural engineer. Please give me a call next week to discuss.

Let me know what your schedule is like in the next couple of weeks. I would like to meet you at the job site to go over the scope of repairs and see if we can get an agreed upon price for the repairs and get this thing rolling.

Best regards,

Allyson Delgado

TRV 00219



**HOHBACH-LEWIN, INC.**
STRUCTURAL ENGINEERS
116 New Montgomery St. Suite 914
San Francisco, CA 94105
(415) 318-8520, Fax (415) 318-8522



**Date:** August 4, 2005

| Company: | St. Paul Travellers | Project No: | 3228 |
|---|---|---|---|
| Attention: | Allyson Delgado | From: | Chris Morton |
| Fax No: | (661) 290-2960 | cc: | |
| Project: | 8010 Hollanda Ln. | | |
| Re: | Clarifcation items | | |

☐ Action Required    ☐ For Your Consideration    ☐ Please Comment

☒ For Your Information

_____

**We are sending you:**

Clarification letter for walls and T&G flooring.

**Comments:**

Allyson, Here is the clarification for the items we discussed on Tuesday. Take a look and let me know if this is OK. Call if any questions. I'm in San Francisco all day today, and in Palo Alto Friday until noon or so. Thanks, Chris

**Number of pages including transmittal:** 3

K:\3000-3399 Projects\3228\(C) Correspondence\clarifcation letter.doc

**TRV 00167**



**HOHBACH-LEWIN, INC.**
STRUCTURAL ENGINEERS

118 New Montgomery Street, Suite 914, San Francisco, CA 94105 • (415) 318-8520 • Fax (415) 318-8522

St. Paul Travelers Companies
25756 Hood Way
Stevenson Ranch, CA. 91381
Attn: Allyson Delgado

August 3, 2005

Project: 8010 Hollanda Ln. Dublin, CA.
    Hohbach-Lewin Inc. Project 3228B

Subject: Clarification to Evaluation Report for fire damage to existing structural
    elements.

Dear Ms. Delgado:

Based on my phone conversation with you yesterday, some clarification is needed in regard to a couple of items in the Engineering Report dated December 2004.

Under the section 3-2-2 "Building Frame", we recommended that all the exterior walls be removed and replaced. The north and east exterior walls suffered heavy damage and need to be replaced. The south wall was still covered with damaged sheetrock at the time of inspection. The condition of the studs could not be verified so localized replacement may be required. The same applied to the west exterior wall, which appeared to be structurally undamaged at the garage, but could not be verified at the kitchen where the remains of cabinets and other debris blocked access to inspection of the wall studs. The south and west exterior walls, as well as the wall separating the living quarters from the garage, will require localized stud replacement, based on the contractor's findings when the walls are opened up fully.

Also under this section, we recommended the T&G flooring be removed and replaced. To clarify this, the location referred was in the front portion of the home on the east side. This is the area to be removed and replaced. Other areas appeared structurally sound, but remains of carpet and vinyl tile prevented visual viewing of the flooring. Portions of the flooring should also be replaced if damage to the supporting floor beams is found when they are inspected.

DOUGLAS KOHBACH, S.E.
DAN LEWIN, S.E.
JOAQUIM ROBERTS, S.E.
ANTHONY LEE, S.E.

**TRV 00168**

TIMELY SOLUTIONS BASED ON TIMELESS PRINCIPLES



## HOHBACH-LEWIN, INC.
### STRUCTURAL ENGINEERS

116 New Montgomery Street, Suite 914, San Francisco, CA 94105 • (415) 318-8520 • Fax (415) 318-8522

Under the section 3-3-1 "Sidewall System", we again made reference to removing and replacing all exterior walls. The same applies here as in section 3-2-2. The north and east walls are to be removed and replaced, with localized stud replacement on the south and west sides.

Please let me know if you need any other assistance or clarification.

Sincerely,

Hohbach-Lewin, Inc.

Chris Morton
Lic #C58584

DOUGLAS HOHBACH,    S.E.
DAN LEWIN,                  S.E.
JOAQUIN ROBERTS,       S.E.
ANTHONY LEE,              S.E.

TIMELY   SOLUTIONS   BASED   ON   TIMELESS   PRINCIPLES

**TRV 00169**

# EXHIBIT G

# EXHIBIT G

Sep 13 05 01:24p        ProInsEval/PIE              510 5⁰2 6870              p.1



# Professional
# Insurance Evaluations

**P I E**

2200 Powell Street, Suite 840
Emeryville, California 94608
510/597-0777 • 510/597-1777 (Fax)
www.proadjuster.com

September 13, 2005

Allyson Delgado
St. Paul Travelers
P.O. Box 55475
Valencia, CA 91385-0475

Via U.S. Mail and Fax (661) 290-2960

RE:    Insured:        La Velda Singleton dba Love and Care Preschool
       Policy #:       x-660-333x9953-TCT-03
       Date of Loss:   11/17/04
       Loss:           Fire
       Location:       8010 Holanda Lane, Dublin, CA

Dear Ms. Delgado:

My firm has been retained by your insured, La Velda Singleton dba Love and Care
Preschool, to assess and assert the claim for damages to real and other property on the
insured premises, 8010 Holanda Lane, Dublin, California.

Regarding claim documentation, the California Insurance Code requires that you provide
"claim-related documents" upon request. Specifically, the California Insurance Code
states:

> "2071.   (a) The following is adopted as the standard form of fire
> insurance policy for this state:
>
> The insurer shall notify every claimant that they may obtain,
> upon request, copies of claim-related documents. For purposes of
> this section, "claim-related documents" means all documents that
> relate to the evaluation of damages, including, but not limited
> to, repair and replacement estimates and bids, appraisals, scopes
> of loss, drawings, plans, reports, third party findings on the
> amount of loss, covered damages, and cost of repairs, and all
> other valuation, measurement, and loss adjustment calculations of
> the amount of loss, covered damage, and cost of repairs.
> However, attorney work product and attorney-client privileged
> documents, and documents that indicate fraud by the insured or
> that contain medically privileged information, are excluded from
> the documents an insurer is required to provide pursuant to this
> section to a claimant. Within 15 calendar days after receiving a

**TRV 00220**

```
request from an insured for claim-related documents, the insurer
shall provide the insured with copies of all claim-related
documents, except those excluded by this section.  Nothing in
this section shall be construed to affect existing litigation
discovery rights. "
```

Forward all claims related documents, including recorded statements, correspondence, any and all consultant reports and estimates, within 15 days.

We will prepare a proper review of the policy coverage and assert the insured's rights of recovery under said policy of insurance.

Enclosed are our Notice of Representation and the Insured's Authorization.

Please direct any and all contact or communication to the undersigned.  Your prompt acknowledgement is appreciated.

Very truly yours,

Kevin K. Dawson
Executive General Adjuster
California Insurance License #2C81994

TRV 00221



# Professional
# Insurance Evaluations

2200 Powell Street, Suite 840
Emeryville, California 94608
Telephone: 510/597-0777          Fax: 510/597-1777
877/PIE-0777                     877/PIE-1777
www.proadjuster.com    e-mail: pie@proadjuster.com
License 2C81994

## NOTICE OF CLAIM
## AND
## NOTICE OF REPRESENTATION

To: _Allyson Delgado_
    _St Paul Travelers_
    _via Fax 661/290-2960_

Insured: _LaVelda Singleton dba_
         _Loves Care Preschool_
Type of Loss: _Fire_
Date of Loss: _11/17/04_
Location: _8010 Hobnoch Lane, Dublin_
Policy No.: _X-660-333X9953-TCT-03_

Please be advised that PROFESSIONAL INSURANCE EVALUATIONS has been retained to advise and assist the Insured in the measurement, investigation, analysis and documentation of our claim. You are hereby authorized and name PROFESSIONAL INSURANCE EVALUATIONS as additional payee on all drafts or checks issued by your company.

Insured: _LaVelda L. Singleton_    Dated: _9-8-05_

**CLIENT'S RIGHT TO CANCEL AGREEMENT.** Client has the right, pursuant to Section 15027 of the California Insurance Code, to cancel this Agreement without any penalty or obligation, by sending a written notice of cancellation to Adjuster at the address specified in this Agreement within 72 hours of Client's having signed this Agreement. Notice of cancellation, if given by mail, is effective when deposited in the mail properly addressed with postage prepaid. Notice of cancellation given by Client need not take any particular form and, however expressed, is effective if it indicates the Client's intention not to be bound by this Agreement.

I hereby cancel this transaction

_____        _____
Insured                                Date

TRV 00222

# EXHIBIT H

# EXHIBIT H

 **ST PAUL TRAVELERS**

**FILE ACTIVITY NOTES**

| | | | |
|---|---|---|---|
| **Claim Handler :** | Allyson A. Delgado | **Date :** | 11/18/04 |
| **File Number :** | ACH3121 J | | |
| **Insured Name :** | Love and Care, L.V. Singleton | **Date Notice Rec'd. :** | 11/18/04 |
| **Policy No. :** | 660-333X9953 | **Contact Date :** | |
| **Loss Date :** | 11/17/04 | **Inspection Date :** | |
| **Loss Location :** | 8010 Holanda Ln., Dublin, CA 94568-1434 | **Policy Period:** | 11/17/04-11/17/05 |

GA Activity Log

*Activities recorded in this log are not inclusive of all actions, communications, etc. and activity also co-incides with "correspondence file", "damages", & hand-written notes.*
Nina Sciotti
C & O
(951) 246-1264

### Begin - 30 Day Report

| Date | Issue | Activity/Discussion/Topic |
|---|---|---|
| | **Insured**<br><br>**Risk** | Insured is a preschool/daycare center operating from a converted single family dwelling in a suburb in the San Francisco Bay Area. The building is approximately ??sf of wood framed construction on a raised foundation. It appears that the building was constructed in the mid 1960's. |
| | **Coverage** | A policy of insurance was issued by the   Travelers Indemnity Company of Connecticut  under policy number 660-333X9953 , which will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss which is not limited and/or excluded.  The policy particulars are as follows:<br><br>·       Policy Period: 11/23/03 through  11/23/04.<br>·       Date of Loss:  11/17/04, reported on  11/17/04.<br>        Loss Location:  8010 Holanda Lane, Dublin, CA (Loss Loc.: 001<br>, Bldg.  001)<br>·       Limits of Liability -<br>a.       Real Property: 218,500 .—Coinsurance 90%<br>b.       Business Personal Property:  $34.600.<br>c.       Time Element:  No<br>Coverage·<br>Sub-limits:<br>a.       Ordinance of Law: $250,000<br>b.       Claim Date Expense:    $10,000<br>c.       Outdoor Property:<br>d.       Extra Expense: $25,000<br>        Coverage Forms:<br>CPT100 (7/88),  CPT108 (8/88), CPT 301 (12/86), CPT363 (9/99) · |

G.A. Activity Notes, Page 2
*[Insert Insured Name/Claim #]*                                    Allyson A. Delgado

| | | Coinsurance: 90% .<br>· Deductible: Property Damage, $500;<br>· Mortgagee:<br>Coverage Issues: |
|---|---|---|
| | | |

| Date | Issue | Activity/Discussion/Topic |
|---|---|---|
| | Cause of Loss | Fire—Early investigation is loss is incendiary in nature. Insured is not considered a suspect. Nina Sciotti internal C & O is investigating. |
| | Damages | **A. Building**—The building sustained a significant amount of fire damage. The entire roof structure was damaged in the fire. It appears that ½ of the back wall and ½ of the front wall and the right wall can be saved, the rest will have to be demo'd and rebuilt. We are currently waiting for recommendations from the engineer on which portions of the building can be saved and any code issues that might be involved.<br>**B. Contents**—All of the contents inside the building were damaged by the fire. Contents include toys, books, art supplies, cooking/eating supplies. Insured has been provided a CCW to list claimed contents, but has not provided completed forms to date.<br>**C. Business Interruption/Extra Expense:** The insured has no coverage for loss of business income or extra expense.( check into this)<br><br>**Estimated Reserves:**<br>  **A. Building**—The contractor has advised that his early estimated amount of repairs will be approximately $200,000.<br>  **B. Contents**—Since all of the contents were damaged, we will estimate the replacement cost of the contents at the limits of $34,600. |
| | Salvage | Contents were damaged completely and have no salvage value. Any salvageable building materials will be used in the reconstruction of the building. |
| | Subrogation | The investigation continues as to the cause of loss and possible suspects for the fire. Carolyn Smith in MCU Subro has been assigned to this loss. |
| | **Planned Course of Action/ Unresolved Issues** | 1. |
| 11/18/04 | **Assignment** | Received new loss assignment in Dublin, CA. Called prior adjuster, Jim Davis and l/m for him to cmb. Called and l/m for fire inspector, Nina Sciotti, to cmb. |

G.A. Activity Notes, Page 3
*[Insert Insured Name/Claim #]*                                    Allyson A. Delgado

| | | |
|---|---|---|
| | | Looked at photos of damage on photoweb. |
| | | Engineer will be necessary to determine if structure can be saved based upon the photos of the damages. |
| | | Salvor may be necessary to help insured inventory contents loss. |
| 11/18/04 | **Underwriting** | I called and l/m for Underwriter, Kris Libby, advising her of loss and extent of damage and initial analysis of value of claim. |
| 11/19/04 | **Coverage** | I received email regarding reinsurance as follows: Reinsurance is not applicable until 15M. |
| 11/19/04 | **Investigation** | I s/w prior claim rep, Jim Davis, this morning. He advised that he went out and saw the loss. He has not had an engineer look at it. He has not prepared a scope. He had an appointment with a contractor for Wednesday, but he will cancel that appointment. He met with the insured at the loss site. He provided the insured the CCR's for her to list her contents. He issued a $15,000 advance to the insured on the contents. He called Jamie at ERI to do the Asbestos/Hazmat survey of the property. He forwarded results via email as follows: Ach3121 ERI called and stated that the 9x9 floor tile in about ½ the house is hot and some vinyl in the bathroom.  There is no contamination to the content debris in the yard.  He will fax me doc and I will send to you. I received voice mail back from fire inspector. Her message was a little broken up but she said she had inspected the loss and the fire department had released the loss site. I contacted Murat Zilinki at Walter Springs Construction to meet me at the loss site on Monday 11/22/04. I called the insured I s/w Mrs. Singleton. She advised that she will have someone meet us at the loss site on Monday with a key to the pad lock. I received an email late in the day from prior claim rep advising that the 9x9 tile is "hot" but the rest including contents is o.k. |
| 11/22/04 | **Investigation-- Inspection** | I met at the loss location with the engineer and Murat from Walter Springs Construction. The engineer believes that a portion of the rear wall, a portion of the front wall and the garage walls can be saved. The entire roof structure is a total loss as are the remaining walls. He is going to look into the code issues with the city. It is a possibility that if we were to demo all of the walls that the city may require an upgrade to all of the new codes. He's going to put together a list of codes that he think may be required, so we can make an informed decision regarding the route to take on the repair of the building. |

G:A. Activity Notes, Page 4
*[Insert Insured Name/Claim #]*                                    Allyson A. Delgado

|  |  | The building itself is a shell. It was very difficult to tell in certain areas what interior finishes existed. Contractor and I measured the interior of the structure together and scoped the interior to the best of our ability. The wall framing will be left open until we have more information from the engineer. Contractor will have the agreed upon scope (to date) to me with this week. Insured was provided CCR's still waiting for the insured to provide claim for contents. |
|  |  | S/W Nina Sciotti—She thinks the loss was intentionally started. She pulled samples and believes it was started with accelerated. She doesn't believe the insured is involved. She is continuing her investigation. She confirmed that the scene is released. |
|  | **Coverage** | Note—Law & Ordinance limit is $250,000 per CPT363 9/99 ed. |
| 12/1/04 | **Damage** | S/w Murat. He s/w the engineer who is verifying the code issues that come into play if we tear down vs. save walls. |
| 12/2/04 | **Damage** | I s/w Brian Saari at Harbro. He advised that he was meeting with the insured today and he was wondering if I had received a copy of a scope from Murat yet. I advised Brian that we are waiting on the engineer's recommendations prior to having a completed scope. He wanted to know if the C & O was done and could he clear the exterior debris only. I advised that the scene has been released and he can remove whatever he would like on the exterior (as long as it is not attached to the building). |
| 12/13/04 | **Status** | I received copy of the asbestos test. They show asbestos in 2 areas of sheet flooring approx (463 sf). Will fax copy of test to the contractor. |
| 12/14/04 | **Status** | I s/w Murat. He advised that he will have engineer's report by Thursday. The engineer is sending him the scope/drawings for the recommendations, so that we can come to an agreed scope at our walk-through scheduled for this Thursday at 9am.<br><br>I called and l/m for the insured's daughter (Meleasa) advising that we have to go back out to the loss site on Thursday and need to get access to the building. |
| 12/15/04 | **Follow up** | I followed up with Meleasa cuz I hadn't heard back about getting access to the building tomorrow. I s/w Yvette and she advised that she had left Meleasa a message to call me regarding the access. She wants to get Meleasa's o.k. before she gives me the combination to the lock to gain access tomorrow.<br>She'll call me back asap.<br><br>She called me back and she will have the keys available to me tomorrow to gain access to the building at 9am. |
| 12/16/04 | **Inspection** | Reinspected loss with contractor. We were able to gain access to back yard and come up with an agreed upon scope of repairs/fine tuning the existing scope/estimate. The code items are still in question and will be dealt with separately.<br><br>The contractor was in touch with the engineer earlier in the week and |

G.A. Activity Notes, Page 5
*[Insert Insured Name/Claim #]*

Allyson A. Delgado

| | | |
|---|---|---|
| | | got a verbal on which walls/framing could be saved and which would need to be torn down and rebuilt. |
| 12/17/04 | <u>Coverage—coinsurance</u> | Did a Marshal Swift Valuation on the property to determine if a coinsurance penalty would apply. The value of the building was determined to be $189,272.72 which is below the insured value. As such, no coinsurance penalty will apply. |
| 12/17/04 | <u>Financial—Estimate</u> | Based upon the CFA/LLR completed, will set reserves as follows:<br><br>Building  $200,000<br>Contents $ 34,600<br>Expenses$ 15,000 |
| 12/27/04 | <u>Damages—estimate</u> | Received agreed upon scope from Murat at Walter Springs Construction. I reviewed it and made a couple of changes (added paint to the classroom #1 and deleted the shutters from the rear elevation.) I emailed the scope only to Tom at Vanderbilt and Brian Saari at Harbro as they wanted to bid the job. I emailed the corrected ESX file back to Murat.<br><br>I also received the engineer's report which goes hand in hand with the agreed scope of repairs to the building. The only items not included in the contractor's estimate have to do with code upgrades specifically the ADA required items. Those items will be addressed as the city's plan checker takes a look at the building. |
| 12/27/04 | <u>Verification</u> | I ran a variance report on Walter Springs Const's estimate. I only found a couple of items on the variance report and those were items that weren't listed in the database. I reviewed several of those items with the Means Guide and found that the prices were reasonable.<br><br>I am in agreement with the amount of Walter Springs Construction's estimate of $176,715.59. |
| 12/27/04 | <u>Financial</u> | I will wait for the other bids to come in before settling with the insured. But I will issue the insured an advance on the building portion of the claim of $50,000. |
| 1/17/05 | <u>Investigation—C&O</u> | Received email containing C & O report as follows:<br><br>Attached you will find the final report. As of this e-mail, I have closed this case. Nina<br><br>*St Paul Travelers*<br>Fire Investigation Unit, Western Region<br>951-246-1264<br><br>It appears that the loss is incendiary in nature. The insured is not a suspect. There is a suspect per the local authorities but their investigation is still open. |
| 2/10/05 | <u>Damages—ACV</u> | I s/w the insured's agent, the insured is unsure of a contractor to use and has not gotten any additional estimates. Based upon this, I will go ahead and determine Acv based upon the agreed scope and estimate from Walter Springs Construction. |

**TRV 00388**

G.A. Activity Notes, Page 6
*[Insert Insured Name/Claim #]*

Allyson A. Delgado

Determined ACV of repairs as follows:

**Love & Care--ACV**

| Trade Item | Replacement Cost | Hold Back / Depreciation | Actual Cash Value |
|---|---|---|---|
| Appliances | $ 2,171.46 | $ 868.58 | $ 1,302.88 |
| Cabinetry | $ 14,124.30 | $ 2,824.86 | $ 11,299.44 |
| General Demolition | $ 15,278.03 | $ - | $ 15,278.03 |
| Doors | $ 3,712.70 | $ - | $ 3,712.70 |
| Drywall | $ 7,902.37 | $ - | $ 7,902.37 |
| Electrical | $ 7,973.92 | $ - | $ 7,973.92 |
| Floor--Carpet | $ 1,987.18 | $ 596.15 | $ 1,391.03 |
| Floor--Vinyl | $ 5,216.18 | $ 1,564.85 | $ 3,651.33 |
| Finish Carpentry--Trimwork | $ 1,487.60 | $ - | $ 1,487.60 |
| Finish Hardware | $ 655.59 | $ - | $ 655.59 |
| Framing & Rough Carpentry | $ 35,953.91 | $ - | $ 35,953.91 |
| HVAC | $ 4,235.90 | $ 1,270.77 | $ 2,965.13 |
| Insulation | $ 1,171.48 | $ - | $ 1,171.48 |
| Light Fixtures | $ 1,003.07 | $ 250.77 | $ 752.30 |
| Marbel-Cultured or Natural | $ 249.39 | $ - | $ 249.39 |
| Plumbing | $ 5,522.71 | $ - | $ 5,522.71 |
| Paneling & Wood Wall | $ 457.22 | $ 91.44 | $ 365.78 |
| Painting | $ 8,340.72 | $ 2,919.25 | $ 5,421.47 |
| Roofing | $ 7,995.35 | $ 2,398.61 | $ 5,596.75 |
| Siding | $ 992.88 | $ - | $ 992.88 |
| Soffit, Fascia & Gutter | $ 987.72 | $ 197.54 | $ 790.18 |
| Specialty Items | $ 72.51 | $ - | $ 72.51 |
| Stucco & Exterior Plaster | $ 9,307.03 | $ 1,861.41 | $ 7,445.62 |
| Temp Repairs | $ 853.68 | $ - | $ 853.68 |
| Windows--Aluminum | $ 1,330.05 | $ - | $ 1,330.05 |
| Windows--Vinyl | $ 1,428.00 | $ - | $ 1,428.00 |
| SUBTOTAL | 140,410.95 | 14,844.24 | $125,566.71 |
| Base Service Charges | $ 2,898.92 | $ 2,898.92 | $ - |
| Overhead | $ 14,726.30 | $ 2,169.63 | $ 12,556.67 |
| Profit | $ 14,726.30 | $ 2,169.63 | $ 12,556.67 |
| Materials Tax | $ 3,953.12 | $ 3,953.12 | $ - |
| **TOTALS** | $ 176,715.59 | $ 26,035.54 | **$150,680.05** |
| DEDUCTIBLE | | | $ 500.00 |
| **NET TO INSURED** | | | **$150,180.05** |

G.A. Activity Notes, Page 7                                        Allyson A. Delgado
*[Insert Insured Name/Claim #]*

| Date | Issue | Activity/Discussion/Topic |
|---|---|---|
| 2/11/05 | **Status** | I s/w the insured and advised her of status of claim I explained that we had not received any estimates from any other contractors and as such, we would be issuing a check based upon the agreed upon estimate with Walter Springs Construction at ACV less deductible and less prior paids. I advised her I would be sending her out a letter along with an outline for how the payment was determined and an explanation of the ACV clause in her policy.<br><br>She is currently working out of another location (7106 Johnson Drive, Pleasanton, CA 94588). She states she is still working on the list of bpp but she gets really emotional when she starts to do it.<br><br>She asked about code upgrades. I advised her that she had insurance for code upgrades but that the insurance only covers the cost once it is incurred. The coverage is up to $250,000. |
| 2/16/05 | **ACV Settlement** | I sent letter to insured outlining ACV settlement and enclosed a copy of Walter Springs estimate, the engineer's report, the statement of loss and the ACV breakdown. |
| **Date** | **Issue** | **Activity/Discussion/Topic** |
| 2/16/05 | **Financial** | I sent check to insured for $104,852.59 which is the ACV + emergency service for the building portion of the loss less the deductible and prior paids as outlined on the Statement of loss in the hard file. |
| 4/8/05 | Investigation | I received fire report from Nina Scotti in the mail. The have determined the origin of the fire was in the center of the main front room in the north east corner of the building. Her investigation has revealed that the loss is incendiary in nature. She advised that the Alameda fire department has come up with the same conclusion and they currently have a suspect and are working with the local DA to try to prosecute their suspect. She will send me their report under a separate cover and provide me an update of the info on the suspect as soon as possible. |
| 4/19/05 | Status | Sent status letter to insured. |
| 6/7/05 | Status | Received call from Roger Emet of Emet Construction. He is bidding the job for the insured. He states that there are some differences he sees in the agreed upon scope and what he sees needs to be done. I advised him that I had done a walk-through at the end of last year to agree on the scope and that if he wants to bid the job he needs to do it with the agreed upon scope. I advised him he can send me a summary of his concerns and we can discuss them but that a lot of time has gone by (along with a lot of winter weather) and what he may be seeing now may not be what was there after the fire. He'll get the bid and summary together and send to me. |
| 7/25/05 | Status | Received estimate from Roger Emmett when I returned from vacation on 7/10/05. His estimate is in the amount of $181,469.15. I need to reinspect the loss to determine why there are differences in scope, etc.<br><br>I called the insured and s/w La Velda. Her work # (925) 828-1170/ cell # (925) 339-2724. I advised her that I would like to reinspect the loss this Wednesday at 11:30 am. She advised that she would like to meet me at the loss site. She advised that she is confused about the scope recommended by the engineer and the scope outlined in the contractor's estimate. Furthermore, she hired an architect who drew up plans. They submitted the plans to plan check and she has a whole list |

TRV 00390

| | | |
|---|---|---|
| | | of things the city is requiring. She wants to know what her coverage is for the code upgrades. I advised her that I know she has coverage for the code upgrades but I would check on the limit. I advised her to bring me a copy of the plans and what the city is requiring. I told her that I will look into her concerns and discuss with her on Wednesday. I also asked her to bring the list of BPP that she is claiming as we still have not received anything on this aspect of her claim. |
| 8/2/05 | Engineer report | I called engineer as it had been brought to my attention by one of the insured's contractors bidding this job, that the engineer called for a much bigger scope than outlined on Walter Springs' estimate. I spoke with the engineer and he advised that his recommendations were taken in a very broad way. I advised him that by reading the comments he made, it appears that they are recommending all of the T&G flooring be removed and replaced. He advised that he could see the problem. He will amend his report so that it is more clear. |
| 8/4/05 | Engineer report | I received clarification letter from the engineer. <br><br> It appears that they believe that all the exterior walls need removal and replacement with the exception of the south and west exterior walls and the wall that separates the living quarters from the garage. For those exceptions, he recommends localized stud replacement only. <br><br> With regard to the T&G he recommends only the T & G in the front eastside portion of the building be replaced and that the other areas appear o.k. |
| 8/22/05 | Engineer report | Sent copy of engineer's clarification to insured so she can share it with her contractor and/or the city building department. |
| 8/23/05 | Estimate | Received estimate from Snow Construction last night for the repairs to the building of $248,245.00. It is unclear from their estimate the scope of the repairs, if the scope includes code upgrade items (it appears that it may). It does mention taking the building down to the subfloor, which is not necessary nor recommended by the engineer. |
| 8/23/05 | Damages | Called and discussed claim briefly with the insured's contractor (Mike Snow). He advised that he had not received the clarification letter from the engineer. I advised him I would fax it to him. |
| 9/1/05 | Loss Payee | Received request from insured's mortgagee for a copy of the statement of loss and list of payments listed to date. <br><br> I faxed a copy of this information (expense items redacted) to the mortgagee. |
| 9/2/05 | Damages | I faxed the insured's contactor the engineer's clarification letter asking him to review it and give me a call to discuss. I also asked him to call me with his schedule so that we could meet at the jog site, go over his scope and see if we can get an agreed price of the repairs. |
| 9/13/05 | Correspondence | I received a fax today from a public adjuster containing a copy of his retainer and requesting documents. <br><br> Public Adjuster: <br><br> Professional Insurance Evaluations <br> Kevin Dawson <br> 2200 Powell Street #840 |

TRV 00391